Donald A. HENKE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–702C.

United States Court of Federal Claims.

Jan. 28, 1999.

---

Donald A. Henke, Charlottesville, Virginia, pro se.

Martin F. Hockey, Jr., U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Anthony H. Anikeeff, U.S. Department of Justice, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This case involves a claim by plaintiff Donald A. Henke that the United States, acting through the Drug Enforcement Administration ("DEA"), breached an oral contract to pay Henke for the transportation of 18,000 pounds of marijuana in connection with an undercover sting operation. The matter is currently pending on defendant's renewed motion for summary judgment. Oral argu-

ment, including the taking of evidence pursuant to RCFC Appendix H(1)(c), was held in Washington D.C. on October 27, 1998. For the reasons stated below, the court grants defendant's motion.

## PROCEDURAL BACKGROUND

Plaintiff filed his complaint on November 16, 1993.[1] We dismissed it as untimely on May 10, 1994, on the basis that the cause of action accrued the day plaintiff landed in Mexico to deliver the marijuana. The Federal Circuit reversed and remanded, stating that the cause of action did not accrue until after the post-mission briefing was completed. *See Henke v. United States*, 60 F.3d 795, 800 (Fed.Cir.1995). Plaintiff has filed an amended complaint alleging the following counts: (I) defendant breached an express contract for plaintiff's services; (II) defendant breached an implied-in-fact contract for plaintiff's services; (III) plaintiff relied on the government's conduct to his detriment and conferred a benefit to the government entitling him to compensation; and (IV) plaintiff has a substantive right to compensation under 28 U.S.C. § 524(c) (1994) (hereafter "Section 524"), a statutory provision for rewarding persons assisting in the enforcement of drug laws.

On October 15, 1997, oral argument was on held defendant's motion to dismiss Counts III and IV and for summary judgment on Counts I and II. Defendant sought dismissal of Counts III and IV for lack of subject matter jurisdiction and summary judgment on Counts I and II on the ground that plaintiff can not put forward *prima facie* evidence that either an express or implied in fact contract came into existence. In support of its motion, defendant included the affidavit of DEA Agent Michael Powers, who asserts that he made no contractual promises to Henke.

In lieu of the having Mr. Henke submit an affidavit of his own contesting Agent Powers' statement, the court allowed plaintiff, who appears pro se, to testify during oral argument. On October 23, 1997, the court dis-

missed Counts III and IV for lack of subject matter jurisdiction and denied summary judgment on Counts I and II without prejudice in order to further develop the record as to potential ratification of the alleged oral contract by authorized officials. *See Henke v. United States*, No. 93–702C, slip op. (Fed. Cl. Oct. 23, 1997).

On January 30, 1998, defendant filed a renewed motion for summary judgment as to the remaining counts. It relies on the affidavits of John C. Lawn, former DEA Administrator, James M. Whetstone, former Deputy Assistant Administrator for the Office of Acquisition Management of the DEA, David L. Westrate, former Assistant Administrator of Operations of the DEA, and Chistinia K. Sisk, acting Deputy Assistant Administrator for the Office of Acquisition Management of the DEA. The thrust of these affidavits is that authority to enter into a contract such as Henke alleges rested exclusively at a level higher than Michael Powers, the Resident Agent in Charge at the Tampa office, and the person with whom plaintiff dealt directly. Lawn, the only official with requisite authority, specifically denied approving any contract with Henke.

In response to the renewed motion, plaintiff submitted his own affidavit, along with those of Stephen R. Beck, former DEA Special Agent, John P. Mouyos, former contract pilot, and Norman R. Henke, brother of plaintiff. In order to better understand whether there was a genuine dispute as to a material fact, the court conducted an evidentiary hearing on October 27, 1998. Defendant presented live testimony from three witnesses familiar with how the DEA conducted operations during the relevant period. These witnesses were Lawn, Westrate, and Powers. Plaintiff was permitted to cross examine the witnesses and to testify in response to their statements. After considering the parties' submissions, as well as the live testimony, the court is persuaded that the facts necessary to determine whether a contract came into existence are not materially disputed.

1. Plaintiff originally filed a complaint in the U.S. District Court for the Western District of Virginia on May 14, 1992. The district court dismissed the action for want of jurisdiction on May 19, 1992.

## FACTUAL BACKGROUND

*The DEA*

The DEA is the lead agency responsible for enforcing the controlled substances laws and regulations of the United States. As part of its enforcement strategy during the 1980s, the DEA, with the support of other foreign governments, conducted elaborate sting operations directed at reducing the flow of controlled substances into this country.

According to Agent Powers, he and other agents within the DEA developed a way to infiltrate the system used by drug traffickers to transport illegal narcotics into the United States. As part of this plan, undercover DEA agents sought out drug traffickers and offered to transport illegal narcotics into the United States for a fee. Because most of the drugs came from overseas, agents represented to suspects that they had access to vessels and aircraft needed to transport the drugs. Such a service was attractive to the suspects because efforts to transport drugs on their own were expensive and often failed. After striking a deal with the targeted individuals, the agents made the necessary arrangements to carry out the mission. As part of the arrangements, the agents sometimes received large amounts of money from the suspects up front to cover expenses. After successfully transporting the drugs into the United States, the agents would meet with the suspects at a designated location to exchange the drugs for the balance of the payment. At some point after the exchange, the agents would arrest the suspects and recover the narcotics. The DEA might also seize and forfeit assets associated with the illicit drug trafficking pursuant to the Controlled Substance Act, 21 U.S.C. § 801 *et seq.* (1986).

These types of operations were primarily conducted out of the DEA field offices with oversight and assistance provided by DEA headquarters in Washington, D.C.[2] Once a case agent located a prospective buyer, that agent would then meet with the group supervisor to go over the specifics of the operation.

The group supervisor would then prepare a memorandum outlining the case for the Special–Agent–in–Charge ("SAC") of the field office. According to Westrate and Lawn, the SAC was required to seek approval from headquarters before conducting any mission involving cooperation with foreign countries, which most of these operations did. Under such circumstances, the SAC would send a memorandum outlining the specifics of the operation to headquarters where it would be reviewed by the Undercover Review Committee. The SAC would also request any assistance needed in conducting the operation, such as coordination with foreign governments, as well as funding needed to cover the costs of the operation. Westrate testified that such requests would not necessarily be part of the same memorandum, however.

The Undercover Review Committee is a group located at headquarters that screens for sensitive issues which may arise during an investigation. Since these missions often involved foreign counties, headquarters would coordinate the mission with the foreign governments, requesting travel clearances for its agents and permission to fly through protected airspace. Lawn and Westrate testified that their subordinates at headquarters would conduct these reviews. A particular mission would only be brought to their attention if something unusual occurred, such as a hostage being taken or an international problem arose.

As indicated above, in order to perform its mission, the DEA sometimes utilized the cooperation of private citizens, referred to as cooperating individuals ("C/I"). Their participation in the investigations ranged from information gathering to actual involvement in the field. The type of operation at issue here typically prompted a need for transportation. The DEA thus actively recruited pilots such as Henke who could supply their own airplanes and vessels to act as "taxi drivers" for the narcotics.

Westrate testified that funding to pay for this type of private support came from three sources: (1) Purchase of Evidence/Purchase

---

2. Past tense is used in describing the practices of the DEA. The court does not mean to suggest that these practices are or are not in use today.

of Information ("PE/PI") Accounts; (2) Trafficker–Directed Funds Accounts; and (3) the Asset Forfeiture Fund set up pursuant to Section 524. PE/PI funds were Congressionally authorized funds used by the DEA to cover expenses in connection with purchasing evidence or paying for information. Each division office received an annual PE/PI allowance apportioned on a quarterly basis. If additional funds were required to perform an operation, the SAC at a divisional office (in this case the Miami SAC) requested a supplemental allowance from DEA headquarters. SACs had independent authority to make payments up to $25,000 per quarter to a C/I from these funds. Expenditures greater than $25,000 to a C/I required prior approval from the DEA Deputy Assistant Administrator, located at DEA headquarters in Washington, D.C.

Trafficker–Directed Funds came from monies provided to DEA undercover personnel by suspected drug traffickers to cover expenses of a particular drug-related activity. These funds were collected in DEA bank accounts and used to pay for the costs of performing tasks requested by the suspected drug trafficker, such as importing controlled substances to the United States. As with PE/PI funds, SACs could approve payments from these accounts to a C/I of less than $25,000. Payments greater than $25,000 required prior approval from the DEA Assistant Administrator of Operations.

The third source of funding, the Asset Forfeiture Fund, was created by the Controlled Substance Act, which allows civil forfeiture of assets related to criminal narcotics activities. 21 U.S.C. § 801 *et seq.* (1984). Money from such seizures was collected in a fund maintained by the Department of Justice ("DoJ") pursuant to Section 524. At the discretion of the Attorney General, awards from this fund were paid to private citizens who supplied assistance: 1) directly relating to violations of criminal drug laws pursuant to Section 524(c)(1)(B); or 2) leading to suc-

cessful forfeiture pursuant to Section 524(c)(1)(C). *See* Section 524(c)(2). A forfeiture was not required in order to consider a C/I for an award. *See* Drug Enforcement Admin., U.S. Dep't of Justice, DEA Agents Manual ("Agents Manual") at 220 (1987).[3]

Following an operation, a C/I could petition to receive a reward for assistance in the investigation. Such a request was forwarded to the SAC in charge of the operation by the field agent. The SAC then prepared a memorandum including a recommendation on behalf of the C/I and forwarded the request and the recommendation to the Deputy Assistant Administrator of Operations for approval. Authority to pay awards under this statute was delegated to the Administrator of the DEA, the Deputy Assistant Administrator of Operations, and SACs depending on the amount. 28 C.F.R. § 0.101(d). SACs could approve awards to a C/I up to $25,000 per quarter. The Deputy Assistant Administrator had authority to approve awards beyond $25,000. Requests for $250,000 or more required approval from the Administrator of the DEA. *See* Agents Manual at 221–24.[4] Agents were instructed not to promise a C/I an award in advance because requests for awards were submitted at the end of the investigation and were paid at the discretion of SACs, the Deputy Assistant Administrator, or the Administrator. *See id.* at 222.

*Plaintiff's Prior Involvement with the DEA*

Plaintiff served in the United States Army Special Forces and obtained his pilot's license in the early 1970's. After obtaining his own aircraft, plaintiff began training to conduct clandestine airborne operations for various government agencies. Beginning in 1981, plaintiff piloted several undercover missions for the DEA office in Oklahoma. These missions were similar to the type described by Powers, discussed above.

During a search for pilots, Powers had heard about plaintiff's participation in a case

3. Any award to a C/I made pursuant to Section 524(c)(1)(B) or (C) precluded that individual from receiving any additional award based on a forfeiture resulting from the same information or assistance. *See* Agents Manual at 220–21.

4. Although the Agents Manual is unclear as to the upper limit of the Deputy Assistant Administrator's authority to approve awards, Lawn testified that he was the only person within the DEA with the authority to approve awards of $250,000.

involving the DEA office in Oklahoma. In February 1985, Powers contacted plaintiff and asked if he would be interested in participating as a pilot in a mission being conducted out of the Tampa office. The mission involved the controlled delivery of cocaine from Los Cedros, Colombia to Sarasota, Florida. Powers and plaintiff met several times to discuss the feasibility and costs of the mission. Plaintiff claims that he "consented to perform the mission for a fee of $50,000 on Powers' condition that the controlled substance be successfully dropped at the designated landing zone in Sarasota." (Pl.'s Resp. to Def's Supplemental Mot. for Summ.J., Henke Decl., App. at 23). Plaintiff's expenses for the mission were approximately $25,000.

On February 19, 1985, plaintiff completed the mission and returned to Tampa where a post-mission debriefing was conducted. Approximately one week later, plaintiff met with Powers in Tampa in order to receive his fee. Plaintiff testified that Powers handed him $25,000 and stated "that's all I can get right now. I can't get any more for this mission.... I'll get you the rest of the money later." Plaintiff testified that this raised concerns with him about being paid and prompted him to tell Powers "if you want me to do these deals, you owe me this money. Otherwise don't call me." Eventually, plaintiff did received the remaining $25,000.

On several other occasions between 1985 and 1988, plaintiff, at Powers' request, arranged for the transportation of cocaine from Colombia to DEA-designated locations in the United States.[5] Plaintiff would meet with DEA agents prior to these missions to receive instructions, which included the location of the cocaine in Colombia, the delivery destination in the United States, and the time of pick up and delivery. These missions were followed by a post-mission debriefing session in the DEA office, in which plaintiff discussed observations made during the mis-

sion.[6] Plaintiff performed these missions using a small twin engine aircraft. As the missions progressed, the DEA modified plaintiff's aircraft, adding larger fuel tanks to allow him to go further into Colombia and high frequency radios to allow the DEA to contact plaintiff during the mission.

Plaintiff alleges in his complaint that he reached an agreement with Powers in advance of each mission for payment of money. According to plaintiff, his terms for performing such missions were always those as described in a January 23, 1986 letter he wrote to Paul Teresi, Resident Agent in Charge of the Ft. Lauderdale office:

My fee schedule is on record and has not changed since December 10, 1984. It is:

Aircraft and pilot services from U.S. point of departure to Colombia and return to Government designated point, $50,000.00. $10,000 is required immediately prior to departure from the U.S. and the balance is due on proper delivery of the controlled substances, or balance due at another time through prior arrangement.

Plaintiff testified that a successful mission in his terms meant that "if I put the narcotics where the DEA wants it—if I deliver the goods—I have conducted a successful mission and for that I get paid." To show that these were the terms of his agreement with the DEA, plaintiff testified that on two missions performed for other DEA offices he was unable to deliver the narcotics because the drugs were not available at the Colombian end of the mission. In those instances, he did not request payment because under his terms of the agreement the mission was not successful—he did not "deliver the goods."

The sources of money paid to plaintiff for these cocaine operations varied from mission to mission. For most missions, Powers provided plaintiff $10,000 in up-front money from the Trafficker–Directed Funds to cover

---

5. There is some dispute regarding the classification of plaintiff with respect to the DEA. Defendant considered plaintiff a "cooperating individual." Plaintiff claims that he was considered a "contract employee." The DEA's records refer to plaintiff as both a "cooperating individual" and a "contract pilot."

6. While both parties dispute the exact number of missions in which plaintiff participated, there is no dispute that there was a working relationship between the plaintiff and the DEA.

expenses. If those funds were not available, Powers would seek PE/PI funds by submitting a request with the SAC in the Miami office. Powers testified that he wanted to be certain that plaintiff had at least $5,000 in cash up front so that in the event he got into trouble in Colombia, he could buy his way out. In those instances in which Powers was unable provide up-front money, plaintiff paid for the initial expenses of the mission himself.

After the mission, Powers arranged for payment of the balance of the $50,000. Such payments usually came from the Asset Forfeiture Fund upon plaintiff making a specific payment request pursuant to Section 524(c)(1)(B). If money from the Asset Forfeiture Fund was not available, Powers requested PE/PI funds from the Miami office. These requests were occasionally denied because there were not enough funds available in a particular quarter to pay plaintiff. In those instances, Powers testified that he put plaintiff on a "payment plan." At the beginning of the next quarter when the Miami office received additional funds, Powers put in another request on plaintiff's behalf. For some missions it took several months before plaintiff received the entire $50,000. The only instance in which plaintiff claims he did not receive payment according to his terms of the agreement involves the mission at the center of this dispute.

*The Mission*

According to plaintiff, Powers called him in February 1987, and stated that he had an interesting case which involved high-level Colombian drug traffickers. Powers inquired about an aircraft that would be able to transport 18,000 pounds of marijuana from Colombia to a landing strip in Coahuila, Mexico. This mission was different from prior operations because it involved marijuana transported to Mexico, whereas the other missions had involved cocaine brought into the United States. Marijuana is much bulkier, and plaintiff's transportation arrangements could not be the same. Although it is not clear whether plaintiff was informed at the time,

DEA expected that after the marijuana arrived in Mexico, it would then be trucked into the United States whereupon it would be traced by the DEA.

Plaintiff told Powers that because of the size of the load, a DC–6 aircraft would be required, a much larger aircraft than the twin-engine plane plaintiff had used for cocaine missions. The DC–6, a four-engine transport plane, used 400 gallons of fuel per hour at a cost of approximately $2.00 per gallon. It required a seven-man crew, compared with a two-man crew for the twin-engine aircraft. Landing fees and other logistical expenses were also higher. After a few weeks of searching, plaintiff called Powers and informed him that he had located a DC–6 in Detroit, Michigan.

Plaintiff testified that he and Powers "discussed" the fee arrangement. Plaintiff priced the mission at $250,000 to deliver the drugs to Mexico. According to Powers, he made no promises to plaintiff regarding payment other than that he would recommend an award if the investigation were successful. Powers testified that he told plaintiff "I'll do the best I can for you, if we get the money at the end of this case, we're certainly going to give you a significant chunk for your expenses and then for a reward for doing this case." Powers testified that he was unable to provide up-front money to plaintiff because the suspected drug traffickers did not provide any Trafficker–Directed Funds for this mission. Marijuana dealers, he explained, operated differently than cocaine dealers. They rarely had money in advance of a mission, and frequently had to rely on sales of marijuana at the other end to generate money to pay for transportation. Additionally, since marijuana cases were not considered a high priority by the DEA at the time of this investigation, Powers did not put in a request to headquarters for PE/PI funds on behalf of the plaintiff.[7] The plaintiff did not contest these factual assertions in either of his two evidentiary appearances.

Powers testified that it was his understanding that any payment to plaintiff for the

---

7. The only request Power submitted for additional funding for the mission was in October of 1987. This request included $50,000 to cover

internal DEA costs, such as agent travel, and $15,000 for the original informant on the case.

mission would come from the Asset Forfeiture Fund at the discretion of the Deputy Assistant Administrator. He testified that for this reason, he told plaintiff on several occasions prior to the mission that "if we don't get paid on this case, you don't get paid." Additionally, he testified that he informed plaintiff "if you can't afford this, don't do it because we don't know that were going to get paid in this case." Plaintiff testified that the warning he received from Powers about the possibility of non-payment was the same warning that he received on all the previous missions: "I don't think this operation may turn out as planned. If it doesn't come off as planned, you'll have trouble getting paid."

Plaintiff testified that he received a "green light" for the mission in June 1997. He then paid $44,000 to the owner of the DC–6 as a deposit for use of the aircraft and began training a crew to fly the mission. In the ensuing months, the DEA changed its mind about the mission several times. Plaintiff testified that in August 1987 he expressed his concerns about the mission in a conversation with Russ Reina, a DEA case agent from the Tampa District Office assigned to this investigation:

> I don't want this to get canceled at the last minute. I have to move a plane from Detroit all the way to Florida with a seven man crew and put them in hotels for two days. I don't need that kind of expense if you're going to the eleventh hour and cancel this mission again. I'd rather you just scrubbed it now and just write me out of it. Find somebody else if you want to go forward.

Plaintiff testified that Field Agent Reina assured him that the mission would proceed and that he would get paid: "It's a go mission. Not a problem. You'll get paid. Everything is fine. Let's just go with the mission. We need to get this done." Based on this assurance, plaintiff proceeded. On November 5, 1987, Powers gave plaintiff the pick-up information and other instructions. On November 13–14, 1987, plaintiff followed

the instructions and delivered the marijuana to unknown persons in Mexico. The marijuana was off-loaded from the aircraft onto several pickup trucks. Ultimately, despite the successful delivery, the marijuana was not transported across the U.S. border in accordance with the goals of the investigation. According to Powers, no arrests, convictions, or forfeitures by the United States resulted from the investigation.[8] A number of people were arrested by Mexican authorities.

On November 14, 1987, the plane and crew returned to the United States, landing at Laughlin Air Force Base, Del Rio, Texas. Plaintiff was asked by DEA officials to prepare for a second trip to Colombia to pick up another load of marijuana. On November 16, 1987, he moved his aircraft to Hondo, Texas where it underwent engine reconditioning. Later that day, Powers informed plaintiff there would not be a second trip to Colombia. He instructed plaintiff to release the crew, subject to the post-mission debriefing scheduled for November 28, 1987, in Tampa. Approximately two weeks later, Plaintiff and his crew members attended the debriefing in Tampa with Powers and Reina. Following the debriefing, plaintiff made repeated oral requests to Powers for payment.

Plaintiff and defendant have differing interpretations of what constituted a successful mission. Defendant claims the purpose was to apprehend illegal drugs or contraband as well as those involved in distributing it. This mission was not successful. Plaintiff claims the "mission" was simply to "deliver the drugs" to Mexico. This mission was completed on November 28, 1987, the day of the post-mission debriefing.[9] Plaintiff never received any payment for the mission, despite numerous oral and written requests. Plaintiff alleges that he incurred approximately $147,000 in expenses to complete the mission.

Powers testified that he did not submit a request for payment from the Asset Forfeiture Fund on plaintiff's behalf because no arrests or forfeitures were made as a result

---

8. An internal memo suggests, however, that one arrest may have occurred in the U.S.

9. See Henke, 60 F.3d at 800. As explained, infra, this fact dispute does not preclude summary judgment.

of the mission. Westrate testified that if a request for $250,000 had been submitted, it would have come to his attention. Westrate testified that if that had happened, he would have forwarded such a request to Lawn. Lawn was the only person at the DEA who had the authority to approve a request for $250,000. It is undisputed that he did not receive any such request. He testified that if he had received such a request, he would have brought it to the attention of the Attorney General, but no such request was made to him before or after the operation. He also testified that he was not aware of any prior contractual arrangements between Powers and plaintiff for any amount.

Defendant offered into evidence various forms of correspondence (referred to by the parties as either "D–6 Forms" or "cables") from the Miami and Tampa field offices to headquarters regarding the mission. Although these documents suggest that headquarters was aware of the details of the mission, none suggest a prior agreement with Henke or request approval of any amount of payment to plaintiff.

On February 15, 1989, plaintiff wrote Powers requesting a written statement from the DEA for tax purposes confirming his work on the mission.[10] On May 24, 1989, plaintiff submitted a written claim pursuant to Section 524(c)(1)(B), (C) for twenty-five percent of any forfeitures resulting from the November 1987 mission. That claim was rejected by the DEA in a letter from Powers on June 2, 1989: "As previously discussed with you, DEA cannot assist you with certain expenses incurred during your contract work as a pilot. In the instant case I discussed with you paying your expenses and an appropriate reward if the case was culminated successfully.... [T]he case was not successful."

Plaintiff responded in his June 9 letter, again requesting a detailed statement for submission to the Internal Revenue Service. Plaintiff wrote to Powers, in relevant part:

> [Reina] asked me if I would finance a DC–6 load of marijuana to be picked up in Colombia and delivered to Mexico. When I asked him why I needed to consider

financing the load he told me (DEA) headquarters would not put up the money for 'that type of case'. He assured me that there would be no problem being paid, that I would receive the delivery money "within forty-eight hours" of delivery in Mexico, that he knew the people involved, and that they had the "money to do the deal".

> . . . .

> I agreed to finance the operation in return for a payment of $250,000. He said he could not speak for that amount of money to which I told him I needed a strong assurance that I would get $250,000 or it wouldn't be worth my effort to do the deal. He said he would talk to you about it. I told him that Mike Powers was always good for his word and that if you approved $250,000, I would finance the load. Three days later, at 4:20 pm on 13 August 1987, Reina called me and told me you had "no problem" with my fee. Apparently, you had a "problem" but nobody told me.

> . . . .

> Sometime in September you called me to your office to get an update on what was happening. You, I and Russ Reina sat in your office and went over the deal. During that conversation, Reina said, "now there is a chance we won't get paid, so you need to be aware of that, but there should be no problem getting the money, but you need to know there is possibility this will not come off as planned."

> You said, "Are you sure you want to do this?" And I said, "yes". You told me that you didn't want me to get into this deal if I couldn't handle it financially ... What I discovered that day that you did not know was that Reina and I had already started the process that led to the lake bed in Mexico....

> I figured everything would turn out okay in the end.

> . . . .

> Four days prior to the first attempt to depart for Curacao/Colombia, I quizzed Reina again about getting paid and he told

10. Apparently, plaintiff wanted to use the expenses as a business deduction. An invoice for $250,000 was also sent to the DEA on April 28, 1989.

me, "Right, 48 hours after delivery. We'll meet in Houston and get the money there"....

....

Surely you understand that I understand that I will never be paid for that operation into Mexico, at least not directly. Because IRS regulations allow for bad debt, and DEA has never paid me for the service that I rendered at their request, I am entitled to the bad debt claim.

(Def.'s Mot. for Partial Dismissal and for Partial Summ.J., App. at 29–31.)

After a second letter from plaintiff on June 23, Powers responded on July 20, 1989: "My letter [of June 2, 1989,] clarified DEA's position. I can only add that in this case, you could have been paid up to $250,000 as a reward and to cover your expenses, which I understand were extensive. Due to factors beyond your control the case was not successful, despite our efforts."

Plaintiff's further attempts to get payment from the agency were unsuccessful. He therefore commenced this action.

## DISCUSSION

Plaintiff asserts that an express oral contract arose between Powers and himself in which he would be paid $250,000 for the delivery of 18,000 pounds of marijuana from Colombia to Mexico. Alternatively, he argues that an implied-in-fact contract arose when Powers and his superiors permitted plaintiff to undertake this mission with knowledge that Henke expected to be paid according to his terms.

Defendant argues that neither an express nor an implied-in-fact contract existed between the DEA and plaintiff. Specifically, defendant contends that there was no mutuality of intent to enter into a binding contract and that, even if Powers did intend to contract with plaintiff, he lacked the requisite actual authority to bind the United States. As to an implied-in-fact contract engaging persons with contracting authority, the government argues that there is no evidence of the requisite knowledge, much less an endorsement of the agreement, by those in authority.

There is no dispute that plaintiff provided services that he was not obligated to perform and that, assuming this performance were bargained for, the services would constitute consideration sufficient to support a contract. The court will also assume that, if an agreement was struck, there is a disputed issue of fact as to whether the mission was successful. The real issues here are whether any bargain was struck and, if one was, whether the government's assent was obtained through an authorized representative.

Plaintiff has not put forth sufficient evidence to survive summary judgment with respect to the assertion of an express oral contract. The events surrounding the disputed agreement began with Agent Powers contacting plaintiff in February 1987 to discuss a mission involving the delivery of 18,000 pounds of marijuana from Colombia to Mexico. Plaintiff testified that he and Powers subsequently "discussed" the fee arrangement in which plaintiff priced the mission at $250,000. Powers stated in his affidavit and also testified, however, that he made no promises to plaintiff regarding payment of money. Plaintiff in his testimony did not directly contradict these statements. Instead, in order to demonstrate evidence of Powers' express agreement to this fee arrangement, plaintiff relies on discussions he had with Special Agent Reina, Powers' subordinate. Plaintiff included excerpts from these discussions in his June 9, 1989 letter to Powers: "Reina called me and told me you had 'no problem' with my fee." Additionally, plaintiff testified that Reina assured him that the mission would proceed and that he would get paid: "It's a go mission.... You'll get paid." Plaintiff concedes that Reina had no authority to contract, but he testified that he considered Reina's comments the "final impetus" needed for him to proceed with the mission, presumably because Powers was behind the agreement.

The problem for plaintiff is that, even assuming he discussed his fee arrangement with Powers, there is no direct evidence to contradict Powers' unequivocal denial that he agreed to plaintiff's terms. Instead, the evidence is fully consistent with Powers' expla-

nation that he told plaintiff "I'll do the best I can for you, if we get the money at the end of this case, we're certainly going to give you a significant chunk for your expenses and then for a reward for doing this case." Powers stated that he told plaintiff on several occasions prior to the mission that "if we don't get paid on this case, you don't get paid." Additionally, he testified that he informed plaintiff "if you can't afford this, don't do it because we don't know that were going to get paid in this case." This offer of proof by defendant is not challenged.[11] Indeed, Powers' current explanation is fully consistent with Henke's letter of June 9 to Powers, in which he recounts events from his perspective. There he describes a conversation between himself, Powers and Reina:

Reina said, "now there is a chance we won't get paid, so you need to be aware of that, but there should be no problem getting the money, but you need to know there is possibility this will not come off as planned."

. You said, "Are you sure you want to do this?" And I said, "yes". You told me that you didn't want me to get into this deal if I couldn't handle it financially ... What I discovered that day that you did not know was that Reina and I had already started the process that led to the lake bed in Mexico....

... I figured everything would turn out okay in the end.

From this letter, in other words, it is plain that Henke assumed Powers did not know of Henke's expectation of guaranteed payment. Nothing he has produced in the interim points to a contrary finding.

 Not every expression of intention takes on contractual gravitas. See 1 Restatement (Second) Contracts § 2 (1981). Promises of definite commitment are distinguishable from statements of general intent or expectation. Moreover, when the parties' promissory statements are made with materially different meanings, not known to the other party, no contract arises. See id. § 20; see generally National By–Products, Inc. v. United States, 186 Ct.Cl. 546, 559–60, 405

F.2d 1256, 1263–64 (1969). These general contract principles are controlling here because there is no evidence that there was a meeting of the minds between Henke and Powers to the effect that Henke would be paid $250,000 to "deliver the goods," not as a discretionary reward but as a contract payment. The most generous reading of the evidence Henke has put forward is that Powers agreed that, if the mission was successful, he and Reina were committed to trying to get Henke paid. Not only is this the only possible construction that is consistent with the undisputed evidence, it clearly comports both with the limitations on Powers' and Reina's authority and with the discretionary nature of awards of $250,000 under Section 524, as explained below.

 Plaintiff also failed to put forward a prima facie case of a contract implied in fact between himself and Powers. The requirements of express and implied-in-fact contracts are identical; only the manner of proof differs. See Russell Corp. v. United States, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976). To prove the existence of a contract, plaintiff must show mutuality of intent to contract, consideration, and unambiguous offer and acceptance. See City of El Centro v. United States, 922 F.2d 816, 820 (Fed.Cir.1990) (citing Russell Corp., 210 Ct.Cl. at 608–09, 537 F.2d at 482, and Fincke v. United States, 230 Ct.Cl. 233, 243–44, 675 F.2d 289, 295 (1982)). "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Hercules Inc. v. United States, 516 U.S. 417, 423–24, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). If the United States is a party to the contract, plaintiff must also show that the party who assented to the contract on behalf of the United States had actual authority to bind the United States. See City of El Centro, 922 F.2d at 820 (citing

11. During the evidentiary hearing the plaintiff cross-examined Powers. In his rebuttal testimony, he did not specifically rebut Powers' statements.

*Juda v. United States,* 6 Cl.Ct. 441, 452 (1984)).

■ Neither Powers' words, actions, nor inactions demonstrate an assent to plaintiff's understanding. First, although Powers may have been able to cobble together enough independent authority with respect to earlier missions to pay $50,000, he knew he did not have authority to obligate $250,000. The only potential source for a $250,000 payment would have been the Asset Forfeiture Fund. In this respect, that fund differs from PE/PI funds and Trafficker–Directed Funds. Payment from the latter funds can be made or obligated in advance and they are subject to substantially lower authority thresholds. Only Lawn or the Attorney General, however, had authority to obligate $250,000 from the Asset Forfeiture Fund. Moreover, payments from that fund are made *after* the mission, as a reward, and on a discretionary basis. The statute does not contemplate committing to awards in advance.

Second, one of the "circumstances" here is that the marijuana mission was substantially different from the prior missions, as plaintiff conceded. Unlike the previous missions which involved transporting cocaine into the United States, this operation involved transporting marijuana into Mexico. DEA had less control over the drugs in Mexico and had to rely on authorities in Mexico to carry out the mission. In marijuana cases, the traffickers did not pay upon delivery, as with cocaine missions. The traffickers would sell the drugs first and pay for delivery at some later date. This made the recovery of assets less probable.

According to Powers, it was these circumstances that prompted him to raise concerns about the success of the mission and to ask plaintiff if he really wanted to go through with the mission. As recounted in plaintiff's June 9, 1989 letter, plaintiff himself acknowledged being warned by Powers not to perform the mission "if [plaintiff] couldn't handle it, financially." Also in this letter, plaintiff recites a conversation he had with Reina in which he was told: "now there is a chance we won't get paid, so you need to be aware of that, but there should be no problem getting the money, but you need to know there is

possibility this will not come off as planned." Further, Powers testified that he advised the plaintiff on several occasions that "if we don't get paid on this case, you don't get paid." Plaintiff's recollection of these conversations differs only slightly in that he stated that Powers told him that "if [the operation] does not come off as planned, you'll have trouble getting paid." Powers' conduct and the background circumstances, in short, do not afford any support for the formation of a contract by implication.

The lack of a meeting of a minds is fatal to the formation of any contract, even a contract which Powers might have had authority to negotiate. However, even assuming Powers agreed, in words or deeds, that Henke would definitely be paid for delivering the marijuana, he, like Reina, was indisputably not authorized to enter into an agreement to pay $250,000 by virtue of the dollar limit on his contracting authority. Plaintiff admits in his response to the supplemental motion for summary judgment that neither Powers nor Reina had the authority to bind the United States to pay $250,000. He also concedes that at no time before, during, or after the November 1987 mission was he in contact with anyone higher in the DEA than Powers.

Plaintiff contends, however, that the arrangement that he struck with Powers was ratified by Lawn, the DEA Administrator, because he must have been aware of the benefits the agency would receive from plaintiff's services. A contract arose, in other words, by Lawn's acquiescence in the Henke–Powers arrangement.

■■ Henke is correct, that even in the absence of authority in Powers and Reina, a contract may be found if someone who possesses authority ratifies the unauthorized agreement. The elements of ratification are well known:

> For effective ratification, a superior must have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate.... Where a plaintiff claims the government ratified the act of an agent who acted without authority, "such ratification can

only be based upon a full knowledge of all the facts upon which the unauthorized action was taken."

*California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 27–28 (1990) (quoting *United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901)), *aff'd* 937 F.2d 624 (Fed.Cir.1991) (table).

■ Ratification thus requires not only that there be some conduct or inaction constituting acquiescence, but that the acquiescence must be knowing. As the Court wrote in *Beebe*, "[k]nowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them." 180 U.S. at 354, 21 S.Ct. 371.

■ Plaintiff relies on his prior dealings with the DEA and the circumstances surrounding the disputed mission to support a finding that the agency assented to be bound. Specifically, he contends that the agency as an institution should be charged with knowledge that he had worked out an arrangement with Powers on several prior missions to deliver cocaine to the United States in exchange for $50,000. As explained above, plaintiff contends that on the mission at issue, he was once again contacted by Powers, as he had been in the past, to deliver marijuana to Mexico, and that Powers knew of his demand for $250,000 and nevertheless authorized the mission. Assuming for the moment that those assertions are factually supported, the next step in plaintiff's theory of liability is that the mission was also known to and approved by higher officials within the agency. Plaintiff's evidence, in other words, is directed at two proofs: first, that the terms of contract were worked out in his dealings with Powers; and second, that Lawn knew of the mission at issue and knew of his prior

dealings with Powers. He argues that these facts are sufficient to show by implication the agency's agreement to pay plaintiff if he brought the marijuana to Mexico.

The court will assume that plaintiff could demonstrate that higher authorities in the agency were generally aware of the mission. The D–6 Forms support a general knowledge in headquarters of the mission. Both Lawn and Westrate also testified that travel across international borders, which this mission required, would have been coordinated by headquarters.[12] Moreover, it would be adequate for plaintiff's purposes if Lawn knew of plaintiff's expectation and did nothing about it. It would not be essential that he expressed agreement to Henke's terms so long as there is evidence that he knew of plaintiff's expectation and permitted him to perform. *See* 1 Restatement (Second) of Contracts § 20.[13] There is a missing element in this offer, however. It is critical that there be some evidence to rebut the assertion by Lawn—the only individual authorized to approve this particular contract—first, that he knew nothing about the mission in general and, more important, nothing about any promise to pay Henke.

Plaintiff argues that the court can make the necessary link by inferring that it would be totally unreasonable for Lawn to be aware of the mission generally and yet expect that Henke would undertake a risky mission such as this without some incentive. The court agrees with that inference, but it is insufficient for plaintiff's purposes for two reasons.

First, plaintiff's prior experience with the DEA is not sufficient as proof with respect to the contract at issue. The size of the alleged payment and the fact that the mission was materially different from earlier ones mean that plaintiff has to have evidence of some-

12. Plaintiff alleges that, given the nature of the mission, the DEA Administrator and others in the hierarchy of the DEA and the DoJ had to be made aware of the mission. Specifically, plaintiff alleges: "[T]he American Ambassador in Bogota, Colombia would have to have given permission for this operation to proceed, a grant of authority that could only have been effected through direct coordination between the DEA Administrator and the United States Department of State." (Pl.'s Resp. to Def.'s Mot. for Partial Dismissal and for Partial Summ.J. ¶ 4.) Defen-

dant contends that there is no showing by plaintiff that the hierarchy had any knowledge of the mission, let alone ratified the mission. The court will assume knowledge of the mission.

13. Although not necessary to the result, the court has misgivings that *anyone*, including the DEA Administrator, could commit in advance to a specific payment as a reward. The statute contemplates a post-mission exercise of discretion.

thing more than the possibility that Lawn may have known about the prior payments (in fact there was no such evidence) and the assumption that he knew about the marijuana mission. What is missing in this case is any evidence that Lawn understood that by his alleged approval of the mission he was acquiescing *sub silentio* in plaintiff's expectation of a $250,000 payment.[14]

During the evidentiary hearing, Lawn testified that although he was generally aware of the activities of DEA field offices, the specific details of a mission would only come to his attention if something unusual happened. He said that "this investigation did not come to his attention." He also stated that he did not recall being briefed by anyone concerning any agreement between plaintiff and a DEA agent. If he had received a request for $250,000, he would have "brought it to the attention to the Attorney General." He did not do so in this case because he never received such a request. Thus, the only person authorized to ratify the alleged contract did not have any actual or constructive knowledge of the contract and did not take any steps to ratify that contract, either in writing, orally, or by conduct.

Second, the court cannot ignore the fact that decisions to make awards in the amount plaintiff seeks are wholly discretionary. *See* Section 524(c)(2); *see also Hoch v. United States*, 33 Fed.Cl. 39, 44 (1995). In the absence of evidence to the contrary, therefore, there is no reason to assume that Lawn would not have properly considered that the possibility of a reward in the event of a successful mission was sufficient incentive for plaintiff. The return could have been great if there were several arrests or if a large amount was forfeited or seized and the DEA Administrator was persuaded to reward plaintiff. Henke's performance, even if solicited, in other words, could readily have been construed as a worthwhile gamble directed to a possible reward under Section 524.

Thus, even if Lawn had general knowledge of the mission and of plaintiff's prior relationship with the agency, it would not be sufficient to show ratification of a contract for $250,000, where the circumstances are also fully consistent with paying plaintiff a reward in that amount under Section 524. *See* 1 Restatement (Second) of Contracts § 20. Knowledge of the mission is not enough, and plaintiff has not shown knowledge, either actual or constructive, of the alleged agreement. *See Janowsky v. United States*, 133 F.3d 888, 892 (Fed.Cir.1998) (noting that a draft contract was received by the FBI). There was therefore no underlying assent by the United States to a contract obligation. There was no ratification.[15]

## CONCLUSION

There is not sufficient evidence presented by plaintiff to create an issue of material fact with respect to the formation of a contract or to show ratification by an authorized individual. Defendant's supplemental motion for summary judgment must, therefore, be granted. The Clerk is directed to dismiss the complaint with prejudice. No costs.

---

**14.** *But see Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed.Cir. 1998) ("[R]atification must ... be based on a demonstrated acceptance of the contract.... Silence in and of itself is not sufficient to establish a demonstrated acceptance of the contract....").

**15.** Although the estoppel/quantum meruit count (Count III) was dismissed earlier, the court here confirms that dismissal. The acceptance of plaintiff's services is fundamentally different from a decision to retain goods, particularly when acceptance of the services was fully consistent with the possibility of an award.