**Joseph DUREIKO, as Trustee, and Southern Pine Isle Corporation, a Florida Corporation, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 97–44C.

United States Court of Federal Claims.

Sept. 29, 2004.

George dePozsgay, Coral Gables, Florida, for the plaintiffs and Michael K. Decker, Persaud and Decker, Coral Gables, Florida, of counsel.

Carolyn J. Craig, Trial Attorney, and Todd M. Hughes, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. Jordan Fried and Ramoncito Deborja, Office of General Counsel, Federal Emergency Management Agency, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

### BACKGROUND

Plaintiffs are owners and operators of the Pine Isle Mobile Home Park (Pine Isle), located in Homestead, Florida. Southern Florida was declared a disaster area, and Pine Isle was declared uninhabitable after a severe hurricane. The Federal Emergency Management Agency (FEMA) offered to remove debris from mobile home parks in Southern Florida, without charge, if mobile home park owners would lease space for FEMA's trailers to provide temporary housing for displaced individuals. Joseph Dureiko set aside mobile home lots at his Pine Isle Mobile Home Park for temporary housing, at a rental cost to FEMA of $240.00 per month, per lot. The parties stipulated that a total of 101 leases were signed by FEMA and Mr. Dureiko.

Mr. Dureiko signed a right of entry permit, dated September 16, 1992, to allow the United States Army Corps of Engineers (the Corps) to enter Pine Isle and remove debris. The permit was witnessed by Steele Beller, a Corps employee. Other than Mr. Beller's signature as a witness, no government signature appears on the right of entry permit. Mr. Dureiko also signed an undated release. The release states that, in consideration of the removal of debris from Pine Isle, Mr.

Dureiko released the county, state and federal government and their contractors "from all claims of whatever nature arising from such demolition and removal."

Plaintiffs' complaint in this court alleges that, prior to allowing use of Pine Isle by the government for temporary housing, concerns were expressed to FEMA and Corps personnel by Pine Isle personnel as to the "manner and method of debris removal." Plaintiffs allege that FEMA and Corps personnel promised that the clean up crew at Pine Isle would use rubber-tired equipment; would preserve the infrastructure of the park, including mobile home pads, driveways and utilities; that utilities would be repaired or replaced to code; and that Pine Isle would be restored to the "same or better condition" Pine Isle was in prior to the arrival of the hurricane.

The Corps contracted with Phillips & Jordan, Inc. to remove debris at Pine Isle. Plaintiffs' complaint alleges that, contrary to the promises made by FEMA and the Corps, contractor Phillips & Jordan used equipment with caterpillar-type treads rather than rubber-tired equipment, and that Phillips & Jordan "indiscriminately crushed, tore out, obliterated, destroyed, and removed nearly everything above-and below-ground at Pine Isle, including but not limited to above-and below-ground utilities, concrete mobile home pads, concrete patios, asphalt paving, structures, vegetation and top soil all of which had survived Hurricane Andrew."

Plaintiffs' claims are now on review following a remand from the United States Court of Appeals for the Federal Circuit, *Dureiko v. United States* (*Dureiko III*), 209 F.3d 1345, 1352–53 (Fed.Cir.2000). Originally, plaintiffs filed an agency claim for damage to Pine Isle, which was denied by the Corps. Pine Isle then filed suit against Phillips & Jordan, a contractor for the Corps of Engineers, and the United States in the United States District Court for the Southern District of Florida. The District Court dismissed the claims against the United States as barred by the Disaster Relief and Emergency Assistance Act (Stafford Act), which immunizes the federal government against claims arising from discretionary acts during

disaster relief. The District Court also dismissed the claims as barred by the Federal Tort Claims Act, which similarly immunizes the government from tort claims arising from discretionary acts. *See Dureiko v. Phillips & Jordan Inc.* (*Dureiko I*), No. 95–1441, 1996 WL 825402, at *1–2 (S.D.Fla. Apr. 29, 1996) (citing the Stafford Act, 42 U.S.C. § 5148 (1994) and the Federal Tort Claims Act, 26 U.S.C. § 2680(a) (1994)).

Pine Isle then filed suit against the United States in this court, alleging breach of contract (count one), a taking in violation of the Fifth Amendment (count two), inverse condemnation in violation of the Fifth Amendment (count three) and "fraud in the inducement" (count four), seeking damages in excess of $2,000,000.00.

This court dismissed plaintiffs' complaint. *See Dureiko v. United States* (*Dureiko II*), 42 Fed.Cl. 568, 582 (1998). Count one (breach of contract) was dismissed based on the Stafford Act, the doctrine of collateral estoppel, and a release of claims by plaintiffs. On appeal, however, the United States Court of Appeals for the Federal Circuit rejected the reasoning of the United States District Court for the Southern District of Florida and this court regarding the applicability of the Stafford Act in this case. On reviewing a motion to dismiss, factual allegations in a complaint are accepted as true. According to the Circuit decision, if, as Pine Isle alleged, FEMA contracted for the clean up of Pine Isle, that contract and its required clean up standards would serve as the equivalent of a federal statute or regulation which prescribed the course of action to follow, removing the discretion required by the Stafford Act to immunize government actions. *See Dureiko v. United States* (*Dureiko III*), 209 F.3d at 1352–53.

In dismissing the plaintiffs' complaint, this court also relied on the doctrine of collateral estoppel, or issue preclusion, as to whether FEMA and Corps supervision of contractor Phillips & Jordan during disaster relief at Pine Isle came under the discretionary function exception of the Stafford Act. As noted, the discretionary function exception previously also had been litigated and decided, adversely to plaintiffs, by the United States

District Court for the Southern District of Florida in *Dureiko I. See Dureiko v. Phillips & Jordan Inc. (Dureiko I)*, 1996 WL 825402 at *2; *Dureiko v. United States (Dureiko II)*, 42 Fed.Cl. at 578–80. On appeal, however, the Appeals Court rejected the applicability of the doctrine of collateral estoppel in this instance, narrowly finding that the District Court had addressed the government's discretionary function issue only as to Pine Isle's tort claim in District Court, and not as to other claims. *See Dureiko v. United States (Dureiko III)*, 209 F.3d at 1354–55.

This trial court also viewed the release signed by Mr. Dureiko as barring plaintiffs' claims, rejecting Pine Isle's assertions that the release was entered into only under duress or as the result of undue influence. *See Dureiko v. United States (Dureiko II)*, 42 Fed.Cl. at 577–78. On appeal, the Federal Circuit affirmed in part, rejecting Pine Isle's duress and undue influence arguments, but found the language of the release to be ambiguous, and summary judgment, therefore, not appropriate. *Dureiko v. United States (Dureiko III)*, 209 F.3d at 1357. Because the Federal Circuit judges identified ambiguity in the release, the case was remanded to this trial court to determine "whether the extrinsic evidence supports Pine Isle or the government's interpretation of the release." *Id.* at 1358.

The Federal Circuit also held that the trial court had properly dismissed Pine Isle's Fifth Amendment taking (count two) and inverse condemnation (count three) claims. *See id.* at 1358–59; *Dureiko v. United States (Dureiko II)*, 42 Fed.Cl. at 578–81. Plaintiffs did not appeal the trial court's dismissal of the fraud in the inducement claim (count four). *Dureiko v. United States (Dureiko III)*, 209 F.3d at 1350. Therefore, only the alleged breach of contract claim (count one) remains in this case, along with the issue of the meaning and scope of the release signed by Mr. Dureiko. After protracted and difficult further discovery, the court conducted an evidentiary hearing on the remand issues and the parties submitted briefs.

## FINDINGS OF FACT

Plaintiffs' claims arose during the Hurricane Andrew recovery effort. As noted above, South Florida was declared a natural disaster site by the President. Pine Isle was condemned by the Code Enforcement Section of the Building and Zoning Department, Dade County, Florida, with the following notice:

NOTICE OF UNINHABITABLE MOBILE HOME PARK AND ORDER TO DEMOLISH MOBILE HOMES AND REMOVE DEBRIS FROM UNINHABITABLE MOBILE HOME PARK

This [the Pine Isle] mobile home park has been found by the Minimum Housing Enforcement Officer to be uninhabitable pursuant to Chapter 17C of the Code of Metropolitan Dade County. THIS MOBILE HOME PARK SHALL BE VACATED— SHALL NOT BE OCCUPIED. The owner or holder of a secured interest in this mobile home park shall demolish the mobile homes and remove the debris therefrom within twenty-four (24) hours of this order or the same will be demolished by Metropolitan Dade County, the municipality or the U.S. Army Corps of Engineers or its agents.

Your immediate cooperation in this matter is necessary. If you need any additional information, please contact the undersigned Enforcement Officer.

(emphasis in original).

To respond to the need for housing persons displaced by the hurricane, FEMA planned to bring in mobile trailers to serve as temporary housing. Mobile home park owners, including Mr. Dureiko, were approached to determine if the owners, after cleaning up their parks, would lease space to FEMA for placement of temporary, housing trailers. Mr. Dureiko and other owners did not express interest in this initial FEMA proposal. FEMA, therefore, revised its initial proposal, and offered clean up assistance at no cost to park owners, if they would lease space in their mobile home parks for temporary housing. Defendant acknowledges that when such FEMA clean up assistance was offered at Pine Isle, Mr. Dureiko expressed concern that the proposed clean up process

might further damage his park, and discussed the use of rubber-tired vehicles with FEMA personnel.

Douglas Campbell was a FEMA Disaster Assistance Employee during the hurricane recovery effort. Mr. Campbell testified that, after the mobile home park owners, including Mr. Dureiko, had indicated no interest in leasing cleaned up parks to FEMA, Mr. Campbell inquired as to whether the owners would be interested in leasing their parks if FEMA cleaned up the parks at no cost to the owners. According to Mr. Campbell, Mr. Dureiko "had a concern about possible damage to the park as a result of the clean-up; in particular, the use of rubber-soled clean-up equipment to protect the roadways throughout the park." Mr. Campbell testified that Mr. Dureiko "was pretty adamant about the fact that he didn't want further damage to take place to the park during the clean-up operation." The parties have stipulated that "[t]he park owners were interested in the offer for clean-up assistance but were concerned about damage to the infrastructure of the parks during the clean-up process."

Ultimately, Mr. Dureiko leased sites at Pine Isle to FEMA for the placement of mobile trailers as temporary housing. As to the potential for damage to the park during its clean up by FEMA, Mr. Campbell testified that he informed Mr. Dureiko "that the clean-up process would be conducted through the Corps of Engineers[1] and that I would take his concerns about further damage to the park back to my superiors, who in this case were [sic] Donny Kidd." Mr. Campbell also testified that he had no authority to enter into agreements with mobile home owners, and that he made that lack of authority clear to the owners, including Mr. Dureiko. Mr. Campbell relayed Mr. Dureiko's concerns to Mr. Campbell's FEMA supervisor, including the concern about using rubber-tired equipment during clean up.

Gregory Landry, like Mr. Campbell, was a FEMA Disaster Assistance Employee during the hurricane recovery effort. Mr. Landry is deceased, however, prior to his death he was deposed, and his deposition was stipulated as a joint trial exhibit by the parties. Mr. Landry stated in his deposition that, working with Mr. Campbell, as well as alone, he attempted to identify mobile home parks to receive FEMA trailers as temporary housing for displaced individuals. During his deposition, Mr. Landry stated that he did not remember making promises to park owners about the use of rubber-tired equipment or preserving the park infrastructure. Mr. Landry also stated that he would not have made such statements, "because I had no control over how it would be cleaned up or who would be cleaning it up.... I wouldn't have made a statement of the kind of equipment that would be used, because it wasn't my call what equipment was to be used ...." During Mr. Landry's deposition, the following exchange occurred:

Q. [by plaintiffs' counsel] Do you understand the question? What I'm trying to get at, what was discussed? What did Don Kidd [Mr. Landry's supervisor] give you authority to do in your negotiations with the park owners?

A. [by Mr. Landry] We didn't do any negotiating. In my opinion of what negotiating means, we didn't make any deals. We primarily stated what was on the table so to speak, and that was if you give us the authority to put homes on your spaces that are in your park then the FEMA would take care of the clean up for that particular area.

· · ·

The record contains a number of different right of entry permits used at different sites at the time, which include varying language, based on the reason for the entry on the property. Right of entry permits were used to enter properties for the stockpiling and burning of debris, to install temporary plastic roofing to prevent leaking, to establish staging sites and operation centers and also for debris removal, the reason for entering the

<hr>

1. John Brady was the Corps' Assistant District Counsel during the hurricane recovery effort. He testified that the Corps was the FEMA contract manager for the clean up. FEMA assigned tasks to the Corps, such as damage surveys, debris removal, temporary housing, school construction, and providing water and electricity. The Corps, in turn, tasked private contractors such as Phillips & Jordan to perform the recovery work.

Pine Isle Mobile Home Park. Adding to the confusion, permits for a certain purpose, such as stockpiling and burning debris, did not necessarily contain identical language. Robert Dragonette, the chief of the real estate field office for the recovery effort, testified that language in the forms designed for the same purpose may have varied somewhat because the forms came from different Army Corps of Engineers Districts. The debris removal right of entry permit for Pine Isle is an example of a form which began life as a form for stockpiling and burning of debris, and was subsequently converted into a debris removal permit. However, the standard stockpiling and burning of debris provisions remained on the form, and standard debris removal provisions were not added to the form.

The record contains an example of a debris removal permit actually used in September, 1992, for the DeSoto Mobile Home Park, in Homestead, Florida. The record also contains a right of entry permit form for debris removal, dated September 16, 1992, which was prepared for the Pine Isle Mobile Home Park, but was never signed by Mr. Dureiko or any other Pine Isle representative. Both the DeSoto debris removal permit, which was signed by the DeSoto property owner or the property owner's agent, and witnessed, and the unsigned Pine Isle debris removal permit, authorize entry to:

> remove any and all storm-generated debris from the above described property of the

undersigned or his authorized agent at no expense to said property owner. . . .

The undersigned [property owner] further agrees and warrants that it will hold harmless the City of [Homestead,] County of [Dade,][2] the United States, the United States Army Corps of Engineers, its contractors and subcontractors for any damage of any type whatsoever, either to the above described property or persons situated thereon, and hereby releases, discharges and waives any and all actions, either legal or equitable, which the undersigned has or ever might or may have by reason of any action of aforesaid city and county, its successors and assigns, while removing storm-generated debris from the above property.

In both the signed DeSoto debris removal form and the unsigned Pine Isle debris removal form, the park owners hold the government harmless. Both forms also provided only for a park owner's signature, and a witness to that signature, not for a signature by a Corps of Engineers contracting officer.

Although the purpose of entry onto the Pine Isle Mobile Home Park was debris removal, Mr. Dureiko did not sign a form which contained the above debris removal and hold harmless language. Instead, Mr. Dureiko signed a form originally designed for stockpiling and burning of debris. The signed form for the Pine Isle Mobile Home was modified to read as follows:

Folio No. _____                                                    Date [*16 Sept. 92*]

RIGHT–OF–ENTRY PERMIT—[TO REMOVE DEBRIS][3]

CITY _____                                                    COUNTY [*DADE CO.*]

   The undersigned hereby certifies and warrants that he is the title owner or the authorized agent of said owner of the property described herein, and the undersigned hereby authorizes the Corps of Engineers and its contractors and subcontractors, the authority and permission to enter in and onto said described property for a period of six (6) months _____, beginning [16 Sept 92]. The consideration for the occupancy of said property shall be [–0–].

   The purpose or use of said premises is for ~~stockpiling and burning of~~ debris [removal] at no expense to said property owner.

---

**2.** Both debris removal forms contained blanks for the city and county to be added. The city and county were added to each as reflected above by the bracketed information.

**3.** The language shown in brackets was added to the Pine Isle Right of Entry Permit by hand; the stricken language shown above was lined out by hand. Empty blanks shown above also were empty in the record copy.

PROPERTY DESCRIPTION: [Pine Isle Mobile Home Ct.]

The Government further agrees and warrants that it will hold harmless the landowner for any damage of any type whatsoever, either to the above described property or persons situated thereon, and hereby releases, discharges and waives any and all actions, either legal or equitable, which the undersigned has or ever might or may have by reason of any action, while removing storm-generated debris from the above property.

All applicable county, state and federal regulations shall be adhered to while the site is being used for said purpose.

The Government further agrees that the site will be restored to a condition representative of that at the time of the execution of this instrument.

ADDED CONDITIONS: (None) (See attached) [4]

For the considerations and purposes set forth herein, I hereby set my hand and seal this ____ day of _____, 1992.

Signature [*Joseph Dureiko*]

Witnesses By:　　　　　　　　　　(Print Name) _____
[*Steele Beller*]

Property Owner of [sic] Property Owner's Authorized Agent

Current telephone No. _____

Current Address _____
Fund Cite:　　　　　　　　　　　[*100 Oleander Gecie*] [sic]
96X3125 DZANA3820000000 (AP)　　[*Key Largo FL 33037*]

_____
Contracting Officer
US Army, Corps of Engineers
Emergency Operations Center

The Pine Isle permit, unlike the examples of debris removal permits in the record, but like all of the examples of stockpiling/burning of debris permits in the record, contained a government contracting officer's signature block. The contracting officer's signature block on the Pine Isle permit did not contain a signature.

The permit form in the record at Joint Trial Exhibit 22 for stockpiling and burning of debris contains the same provisions as the form Mr. Dureiko signed for Pine Isle. The forms at Joint Trial Exhibits 18, 19 and 21 also are for stockpiling and burning of debris. Although the language of these forms varies somewhat, in all four stockpiling/burning of debris permits, the federal government agreed to restore the mobile home parks to the condition they were in at the time the permits were executed, and agreed to hold the park owners harmless for damage of any type. A signature block for a government contracting officer accompanies this language. As noted above, these same provisions are found in the Pine Isle debris removal permit, although normal debris removal permits held the government harmless and were signed only by park owners.

Mr. Beller, the Corps employee who witnessed Mr. Dureiko's signature on the Pine Isle right of entry permit, testified that, during the aftermath of the hurricane, his primary duty was to find sites for the stockpiling and burning of debris. Mr. Beller stated that, for Pine Isle, he used a stockpiling and burning of debris right of entry permit form, and altered the form for the purpose of debris removal at Pine Isle, drawing a line through the words, "stockpiling and burning of" debris, and adding the words "to remove debris." Defendant's counsel acknowledges

4. There were no attachments to the record copy of the permit.

that the right of entry permit form presented to Mr. Dureiko for signature by Mr. Beller was one of the forms typically used by the Corps for stockpiling and burning of debris, rather than for debris removal. Defendant's counsel further acknowledges that Mr. Beller altered the form to reflect the debris removal purpose at Pine Isle.

Right of entry permits with signature blocks for a Corps contracting officer would typically come to Mr. Dragonette for signature. As noted above, although not for Mr. Dureiko and Pine Isle, the record contains several such hurricane recovery permits for other property owners, with Mr. Dragonette's signature as contracting officer. The permits in the record signed by Mr. Dragonette as contracting officer were for the stockpiling and burning of debris and for a staging site/operations area, not for debris removal. Mr. Dragonette testified, however, that if the Pine Isle right of entry permit had been presented to him, he would not have signed it as a Corps contracting officer, because the form had been altered. Mr. Dragonette also noted that, in his view, the entry form for the Dureiko property was contradictory, on the one hand indicating that the purpose of the use of Pine Isle was to remove debris and, on the other hand, that the site would be restored to its condition at the time the permit was signed. According to Mr. Dragonette, this would mean restoring the debris which had been removed. Mr. Brady, the Corps' Assistant District Counsel during the recovery effort, for the same reason, stated that the right of entry permit signed by Mr. Dureiko "makes no sense."

The Corps contracted with Phillips & Jordan, Inc. to remove debris at Pine Isle. A tasking document, Task # 4, titled, "Debris Removal at Pine Isle Mobile Home Park," dated September 17, 1992, stated that:

I.   General Scope Description

A.   The Contractor shall provide all labor, plant equipment, machines, and tools necessary to perform demolition and removal of debris from The Pine Isle Mobile Home Park located at 28600 132nd Ave. S.W., Miami, Fl. . . .

II.   Schedule

.        .        .        .        .

B.   The contractor shall proceed with the task upon receipt of notice from COR [contracting officer's representative] and insure that the task is 100% complete within 7 days. . . .

IV.   Scope

.        .        .        .        .

C.   The Contractor shall use only rubber-tired equipment in the performance of this contract. . . . The Contractor shall be responsible for filling to grade with like material all surface damage, such as rutting and cracks, caused by the Contractor's equipment during debris removal. The Contractor shall repair all damage to existing grade, road shoulders, underground/aboveground utilities, trees, shrubs, and grassed areas caused by the Contractor's equipment or personnel. The Contractor shall preserve and protect all existing structures which have not been designated for demolition. The Contractor shall preserve and protect vegetation such as trees, shrubs, and grass on or adjacent to the area of work. . . .

E.   The Contractor is responsible for collecting debris from damaged trailers, sheds, and single family houses at the location indicated above and disposing of it at the appropriate burning debris reduction locations. The Contractor shall coordinate the clearing of all private property with the COR. The Contractor shall insure that right of entry has been secured. Right of entry will be considered a signed permission from the property owner or direction from the COR. The Contractor shall verify any condemnations with the COR prior to beginning demolition. . . .

Another tasking document, issued by the Corps to Phillips & Jordan, Task # 12, titled "Utility Repair at Pine Isle Mobile Home Park," stated that:

1.1.1   General: The contractor shall perform all necessary work to inspect, remove, repair or replace to pre-Andrew condition in accordance with current codes all sewer, water, and electric facilities affect-

ing the 100 lots assigned to the Federal Emergency Management Agency (FEMA) at the Pine Isle Mobile Home Park (28600 S.W. 132nd Ave., Homestead, Florida). These sites shall be completed in such a manner that allows trailers to be brought onto sites, hooked-up, and made fully operational. . . .

1.1.2 Code Compliance: All worked [sic] performed under this scope of work shall be in accordance with the South Florida Building Code, National Fire Protection Association Code Standards and Recommended Practices, the National Electrical Code, the National Electrical Safety Code, and all other applicable Federal, State, and local codes. Latest edition of codes at the time of contract award shall govern. The contractor is responsible for coordination with all appropriate authorities for service connections and access to the site. All necessary permits and inspections shall be acquired by the contractor. The contractor shall furnish and erect signs as required by applicable governing agencies. . . .

1.1.4 Schedule of Work: The schedule for performing this work shall be as follows: Within one calendar day(s) after receipt of this task, the contractor shall begin utility repair.[5] . . .

The parties have stipulated that the clean up of Pine Isle took approximately six days. Martin Dureiko, the son of plaintiff Joseph Dureiko, testified that the government contractor initially used rubber tired vehicles, but that, subsequently, contractor personnel used track vehicles.[6] Martin Dureiko continued, describing the resulting condition of the park:

Terrible condition. There was no grass. Trees were missing that were standing. I saw one operator intentionally tear out a tree. He missed it the first pass and went back and hit it again, loaded it on the truck. Light poles, concrete light poles that were standing after the hurricane were gone. Ten foot by thirty foot cement slabs were missing. All the topsoil was gone. I don't think I've yet to find a patio that wasn't cracked. Some parts of the patios were missing. Some of them were just broken and pushed a bit. Sections of the driveways were missing. Pieces of road was missing. The water and the sewer, all the risers were flattened or gone. A lot of the gas system was ripped out of the ground. Electric boxes and electric conduit was either missing or flattened and destroyed.

Prior to the clean up, Joseph Dureiko also signed a release of claims. The release was witnessed by Gregory Landry, a FEMA Disaster Assistance Employee during the hurricane recovery effort. This "Release for Demolition of Mobile Home Park and Removal of Debris" stated that in consideration for the government's demolition of mobile homes and removal of the debris from Pine Isle, Joseph Dureiko releases the government, and government contractors, "from all claims of whatever nature arising from such demolition and removal."

Joseph Dureiko testified that the release was for the purpose of releasing the government from any liability for the contents of the mobile homes at Pine Isle:

Q. Do you understand this document [the release] to mean that you would not sue the Government as a result of the debris

---

**5.** A contract modification to Task #12 stated that:

Contractor shall provide all labor and materials for final utility connections to FEMA-provided mobile homes. Utilities are electricity, water, and sewer. Connections are from existing contractor-provided water and sewer stub-outs and electric service panels to each individual mobile home.

Testing. Contractor shall test all final utility connections and provide a written certification to the Government. The certification shall indicate that the water and sewer connections

are free from leaks, and the electrical connection is free from shorts and grounds. . . .

**6.** Colonel Terrence Salt, the Corps' head of the Hurricane Andrew Recovery Office, testified that there are "generally two kinds of construction equipment. One kind has wheels, big wheels, rubber tires. The other kind is more like you see in an Army tank which has this track of—this ribbon of metal and sometimes rubber pads that propels it and gives it more stability and it has more contact with the ground so it's able to be more efficient."

removal process, that you released them from claims?

A. As it was explained to me, this document did not affect my property. It only protected the Government from their removal of the tenants of the park's property. That's the way it was explained to me by the people who delivered it, and I had already had the package of how it was going to be done and how I was protected and so forth.

Q. So just so that I understand, you signed this release not based on the language that was in the document but based on what was told to you as what the document meant?

A. That's right. It was explained to me that way.

John Brady, the Corps' Assistant District Counsel, testified that the purpose of the release signed by Mr. Dureiko was to release the government from any liability in connection with the work performed at Pine Isle.

Plaintiffs' breach of contract claim (count one) remains at issue, along with the meaning and scope of the release signed by Joseph Dureiko. The court conducted an evidentiary hearing on the remand issues, and the parties submitted post-hearing briefings for the court's review. The parties do not believe that oral argument is necessary, and the court agrees.

## DISCUSSION

*Breach of Contract*

Plaintiffs argue that the Pine Isle right of entry permit represents a written and fully executed agreement between the parties, and includes a site restoration provision providing for the government to repair any damages suffered during debris removal at Pine Isle. Plaintiffs argue, in the alternative, that if an express contract between the parties is not found, the evidentiary hearing demonstrated the existence of an implied-in-fact contract, including a site restoration provision, which the government breached.

▮▮▮▮ The elements of an express contract are "a mutual intent to contract including offer, acceptance, and consideration; and

authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.) (citations omitted), *cert. denied,* 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997). An implied-in-fact contract is an agreement " 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.' " *Trauma Serv., Group v. United States,* 104 F.3d 1321, 1326 (1997) (quoting *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996)) (quoting *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *see also Schism v. United States,* 316 F.3d 1259, 1278 (Fed.Cir.2002) (en banc), *cert. denied,* 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003); *Bay View, Inc. v. United States,* 278 F.3d 1259, 1265–66 (Fed.Cir.2001) (citing *Trauma Service Group v. United States,* 104 F.3d at 1326), *reh'g and reh'g en banc denied,* 285 F.3d 1035 (Fed.Cir.2002), *cert. denied,* 537 U.S. 826, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002); *Fincke v. United States,* 230 Ct.Cl. 233, 243–44, 675 F.2d 289, 295 (1982); *Thomson v. United States,* 174 Ct.Cl. 780, 791, 357 F.2d 683, 689 (1966). The United States Court of Appeals for the Federal Circuit, in *Barrett Refining,* restated the elements of an implied-in-fact contract as mutuality of intent to contract, consideration, lack of ambiguity in offer and acceptance, and authority to bind the government. *Barrett Refining Corp. v. United States,* 242 F.3d 1055, 1060 (Fed.Cir.), *reh'g denied* (2001). Proof of an implied-in-fact contract requires proof of the same elements described above for an express contract. *See City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991).

The United States Supreme Court, in *Baltimore & Ohio Railroad,* stated that "an agreement will not be implied unless the meeting of minds was indicated by some intelligible conduct, act or sign," and declined

to find an implied-in-fact contract under the facts of that case. *Baltimore & Ohio R.R. v. United States,* 261 U.S. at 598; *see also Russell v. United States,* 182 U.S. 516, 530, 21 S.Ct. 899, 45 L.Ed. 1210 (1901) ("[T]o give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties—'a coming together of minds.'") (quoted in *Hercules, Inc. v. United States,* 516 U.S. at 424, 116 S.Ct. 981); *Barrett Refining Corp. v. United States,* 242 F.3d at 1059–60; *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990). In *City of El Centro,* the Federal Circuit concluded that the finding of facts by the United States Claims Court was not clearly erroneous, that "the various discussions between employees of the Government and of ECCH [the claimant] when taken as a whole evidenced a sufficient meeting of the minds to establish mutuality of intent to contract." *City of El Centro v. United States,* 922 F.2d at 820. The Federal Circuit, however, proceeded to find that there was no implied-in-fact contract in *City of El Centro,* based on the absence of any official empowered to bind the government and any direct benefit to the government from the claimant. *Id.* at 821.

*Meeting of Minds*

■ In the case presently before this court, the record reflects a meeting of minds only on certain terms of the arrangements between the parties. Although the defendant takes issue with the existence of any agreement, express or implied, the plaintiffs describe an agreement between the parties of the following nature:

> [T]he "core" agreement between them [the parties] was that, if Dureiko leased 100 mobile home pads for FEMA trailers, the government would pay rent at the rate of $240 per month per pad and would remove all the hurricane generated debris from Dureiko's trailer park.

In addition to the "core" provisions, plaintiffs' attorney states that the government sought a right of entry permit and a release from Mr. Dureiko, and that Mr. Dureiko sought assurance from the government that if Pine Isle were damaged by the debris removal, that the site would be restored. The plaintiffs suggest an agreement on basic, bright line terms. Plaintiffs state, "[t]he issue, therefore, is not *whether* there was a contract between the parties, but rather, *what the terms* of the contract were." (emphasis in original). The parties part company on whether or not a government representative, possessing the necessary authority, contractually obligated the government to restore the infrastructure of Pine Isle after debris removal. Therefore, the issue before this court is whether the plaintiffs' critical term, site restoration, was agreed to by a government representative with the authority to do so.

A critical contract term was at issue in *Barrett Refining Corporation v. United States,* in which a price escalation clause was found to be unauthorized and unenforceable. The Federal Circuit agreed with the Court of Federal Claims that there could be an implied-in-fact agreement on pricing, and affirmed the lower court's factual findings of the "parties' intent to provide for fair market-value consideration of pricing ...." *Barrett Refining Corp. v. United States,* 242 F.3d at 1060. In contrast, no meeting of minds was found on an alleged critical term in the case of *Atlas Corporation v. United States,* In *Atlas,* claimants argued breach of an implied-in-fact contract, based on an allegation that the parties intended the claimants would be compensated for the stabilization of uranium and thorium milling operations. However, the Federal Circuit concluded otherwise: "[T]he parties have admitted that the extensive tailings stabilization ... was not even contemplated by the parties at the time of the contracts. Therefore, there can have been no negotiation and 'meeting of the minds' that could create an implied-in-fact contract respecting the cost of the stabilization." *Atlas Corp. v. United States,* 895 F.2d at 754. In *Atlas,* a meeting of the minds on the critical term was not found. As in *Atlas,* the record in the present case does not reflect a meeting of minds between Mr. Dureiko and a government representative with the proper authority to obligate the government on the critical term sought by plaintiffs. Moreover,

as discussed below, in the case currently before the court, no government representative with the requisite authority contractually obligated the government to restore the infrastructure at Pine Isle after debris removal.

Although not a clean argument, even based on the literal meaning of the words, plaintiffs rely on the language of the Right–of–Entry Permit for Pine Isle, which states that: "The Government further agrees that the site will be restored to a condition representative of that *at the time of the execution of this instrument*." (emphasis added). Defendant argues that this provision has meaning only in the context of a stockpiling and burning of debris-type of right of entry permit, which was the origin of the form used at Pine Isle. John Brady, an Army Corps of Engineers attorney during the hurricane recovery effort, testified that the Pine Isle permit "makes no sense":

> Well, if you look at the bottom, one of the bottom paragraphs, it states, "The Government further agrees the site will be restored to a condition representative of that at the time of the execution of this instrument." If we actually did that we'd have to put all the debris back. This is a kind of right of entry that would be used for a debris—a temporary storage site for debris or burn site for debris, and after the Government had finished storing the debris there and removed it to its ultimate destination or burned the debris there, then the Government would agree that we would clean up the site so there wouldn't be any remaining pollutants on the site and the contractor—the property owner rather would get the property back in the same condition that we had given it to them in—that they had given it to us in.

Defendant's understanding of the site restoration provision, based on the normal use of the provision in the stockpiling and burning of debris-type permit, and the fact that

such a provision is not found in the examples in the record of the standard debris removal-type permit, supports the conclusion that there was no meeting of minds on the plaintiffs' critical term, that the government agreed to restore infrastructure at Pine Isle. In the same month (September, 1992) that the Pine Isle permit was signed, a standard Corps debris removal form was used for the DeSoto Mobile Home Park, in Homestead, Florida, the same city in which Pine Isle was located. Apparently, amid the turmoil caused by the hurricane, the type of permit utilized for Pine Isle, and witnessed by Mr. Beller, turned out to be one for stockpiling and burning of debris. Mr. Beller, an Army Corps of Engineers realty specialist, testified that his primary duty during the hurricane recovery effort was to find sites for the stockpiling and burning of debris. Mr. Beller proceeded to superficially alter the form for Pine Isle by adding the words "To Remove Debris" at the top of the page, and by crossing out the words "stockpiling and burning of," leaving the word "debris" unqualified and the document reading, "[t]he purpose or use of said premises is for debris at no expense to said property owner," with the word "removal" written in on a line below, with no arrow indicating where in the sentence the word debris was supposed to fit.[7] Rather than intending to implement a site restoration provision for Pine Isle, the Corps inadvertently used a standard stockpiling and burning of debris form, containing a site restoration provision for debris removal, not a debris removal form, which does not contain a site restoration provision.

Colonel Terrence Salt, the Corps' head of the hurricane recovery office, and one of the Corps' two contracting officers on site, testified to an understanding that debris would be removed from Pine Isle, but not to an understanding of the plaintiffs' critical term, restoration of infrastructure. The Corps' only other on-site contracting officer, Robert

---

7. Mr. Beller reported to Mr. Dragonette. Mr. Dragonette testified that realty specialists were told not to alter Corps forms:

> Q. And were any of the people that worked for you in obtaining rights of entry instructed that they were permitted to alter a document *in this fashion to comport to its supposed use?*

> A. To the best of my knowledge, our realty specialists were advised not to alter the document. It tends to change some of the meaning when they do that and they may not realize that that's what's happening. So we asked them not to do that.

Dragonette, who served as the chief of the real estate field office for the recovery effort, testified that he would not have agreed to the Pine Isle permit, because the form had been altered, and also because he would have considered the permit "contradictory," as providing both for removing debris and restoring debris.

The record also contains a "Trailer Park Status Report," dated October 1, 1992, with a list containing both the Pine Isle and the DeSoto mobile home parks. As noted above, a standard debris removal right of entry permit form was used for DeSoto, providing that the park owner would hold harmless the city, county and federal government, as well as the Corps and contractors, "for any damage of any type whatsoever." In spite of a stockpiling and burning of debris-type permit form being used for debris removal at Pine Isle, the Trailer Park Status Report contained identical checks, or marks, for both mobile home parks under the columns for "Status," "Right of Ent" and "Owner Indemn," indicating that the Corps viewed Pine Isle, like DeSoto, as debris removal sites. The court concludes, as discussed more fully below, that there was no meeting of minds between the parties on the plaintiffs' critical term. As with the normal debris removal agreements entered into by the government with site owners, in the case of Pine Isle, the government similarly did not intend to restore infrastructure. The restoration of infrastructure was part of the standard stockpiling and burning of debris agreements the government entered into with other site owners, signed by a government contracting officer, who obligated the government to the restoration. The agreement with Pine Isle intended by the government only was to remove debris and lease pads for displaced individuals.

*Authority to Contract*

Defendant further contends that no government representative with the requisite authority contractually obligated the government to restore infrastructure at Pine Isle. The only government signature on the Pine Isle permit was that of Mr. Beller, who was not a contracting officer, and whose signature was placed on the document as a witness to Mr. Dureiko's signature, under the printed words "Witnesses By." The record reflects that the only government employees authorized to act as contracting officers during the recovery effort, with authority to financially obligate the United States, were Colonel Terrance Salt, chief of the Army Corps of Engineers' hurricane recovery office, and Robert Dragonette, the Corps' chief of the real estate field office for the recovery effort. Mr. Beller, who reported to Mr. Dragonette, testified that he was not a contracting officer. Mr. Dragonette confirmed that he did not delegate contracting officer duties to Mr. Beller, or to anyone else.

A government representative with the requisite authority is a required element of both express and implied-in-fact federal contracts.

The government "is not bound by its agents acting beyond their authority and contrary to regulation." *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1153 (Fed.Cir.1983) (quoting *Yosemite Park & Curry Co. v. United States,* 217 Ct.Cl. 360, 582 F.2d 552, 558 (1978)); *see also Office of Personnel Management v. Richmond,* 496 U.S. 414, 428, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990) (agencies' unauthorized statements to citizens cannot obligate the Treasury for the payment of funds). A contractor who enters into an arrangement with an agent of the government bears the risk that the agent is acting outside the bounds of his authority, even when the agent himself is unaware of the limitations on his authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

*Total Medical Management, Inc. v. United States,* 104 F.3d at 1321; *see also Trauma Serv. Group v. United States,* 104 F.3d at 1327; *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378, 1380 (Fed.Cir.2001); *Jones v. United States,* 49 Fed.Cl. 516, 518 (2001); *Starflight Boats v. United States,* 48 Fed.Cl. 592, 598–99 (2001).

Defendant has raised the authority issue, but plaintiffs have the burden to demonstrate the existence of the government official's authority to contract.

It is well established that the government is not bound by the acts of its agents

beyond the scope of their actual authority. *See Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Trauma Serv. Group,* 104 F.3d at 1325. Contractors dealing with the United States must inform themselves of a representative's authority and the limits of that authority. *See Federal Crop Ins.,* 332 U.S. at 384, 68 S.Ct. at 3. Moreover, "[a]nyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority." *Trauma Serv. Group,* 104 F.3d at 1325. The burden was on Harbert/Lummus to prove that the CO [contracting officer] had the authority to enter into the oral, unilateral contract. *See id.* The fact that Harbert/Lummus may have believed that the CO had authority is irrelevant; Harbert/Lummus must prove that the CO had actual authority. For the reasons set forth below, we hold that the CO did not have authority to enter into an oral contract to continue to guarantee funding of the project until its completion.

*Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1432 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (1998), *cert. denied,* 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999) (citations omitted); *see also Trauma Serv., Group v. United States,* 104 F.3d at 1327 ("TSG must prove all of the requirements for a binding contract in order to prevail under its implied-in-fact contract theory."); *City of El Centro v. United States,* 922 F.2d at 820–21 ("Further, it is ECCH's [claimant's] responsibility to show that Agent Hernandez had the requisite contracting authority." (citing *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 711, 468 F.2d 922, 925 (1972))).

Plaintiffs respond to the authority issue with the contention that an individual with the requisite authority, Colonel Salt, ratified the right of entry permit with its site restoration provision. Colonel Salt was the head of the Corps' hurricane recovery office, with between 650 and 700 Corps employees working on the recovery effort. Colonel Salt possessed an unlimited (no dollar limit) contracting officer's warrant. Although Colonel Salt did not sign the Pine Isle permit which contained the provision for site restoration, plaintiffs argue that:

> The fact that the government proceeded to debris removal and subsequent placement of mobile homes on Dureiko's property is *ratification* of the terms of the ROE [right of entry permit] by Salt, the supreme contracting officer on the site. As the court in *Fincke v. United States,* 230 Ct.Cl. 233, 675 F.2d 289, 295, commented, the "actions and conduct [of the parties] before the inception of a controversy is of much greater weight than what they said or did after a dispute arose." [8]

(emphasis in original) (citations omitted). Plaintiffs cite the government's debris removal at Pine Isle after the permit was executed by Mr. Dureiko as conduct indicating that the permit, with its site restoration language, was "accepted by the government officials (in this case Col. Salt, chief contracting officer) for whom Beller procured the ROE [right of entry]."

The basic concept of ratification requires that a superior official "have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate." *California Sand & Gravel. Inc. v. United States,* 22 Cl.Ct. 19, 27–28 (1990), *aff'd,* 937 F.2d 624 (Fed.Cir.1991) (table), *cert. denied,* 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992). Full knowledge of all of the facts is required:

> commission by the Embassy to the plaintiff, and that no such contract was created between them." *Fincke v. United States,* 230 Ct.Cl. 233, 246, 675 F.2d 289, 296 (1982). Similarly, as noted earlier, there was no meeting of minds between the parties as to the plaintiffs' critical term, site restoration.

8. The United States Court of Claims in the case cited by plaintiffs, *Fincke v. United States,* dismissed the plaintiff's breach of contract claim, concluding "that there was no meeting of the minds inferred from the conduct of the parties that met the requirements of an implied-in-fact contract between them for the payment of a

Agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts. *See United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 375, 45 L.Ed. 563 (1901). The Supreme Court has stated that:

> Where an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken. This is as true in the case of the government as in that of an individual. Knowledge is necessary in any event.... If there be want of it, though such want arises from the neglect of the principal, no ratification can be based on any act of his. Knowledge of the facts is the essential element of ratification, and must be shown or such facts proved that its existence is a necessary inference from them. *Id.* at 354, 21 S.Ct. at 375.

*Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d at 1433; *see also Schism v. United States,* 316 F.3d at 1294 ("At the time of ratification, the purported principal must have knowledge of all material facts concerning the transaction." (quoting Harold G. Geuschlein & William A. Gregory, *The Law of Agency and Partnership,* § 30, at 74 (West 2d ed.1990))); *Henke v. United States,* 43 Fed.Cl. 15, 27 (1999) ("Ratification thus requires not only that there be some conduct or inaction constituting acquiescence, but that the acquiescence must be knowing."); *Khairallah v. United States,* 43 Fed.Cl. 57, 64 (1999).

In *Henke,* the claimant argued that his agreement with a Drug Enforcement Agency (DEA) agent, who did not have the necessary authority to make the agreement, was nevertheless ratified by the DEA Administrator, who did have the necessary authority. *Henke v. United States,* 43 Fed.Cl. 15, 26 (1999). The claimant in *Henke* contended that the "agency as an institution should be charged with knowledge that he [the claimant] had worked out an arrangement with

Powers [the DEA agent] on several prior missions ...." *Id.* at 27. The court in *Henke* assumed for purposes of its opinion that the claimant could demonstrate that DEA officials were generally aware of the mission from which the claim stemmed. *Id.* The court, however, concluded that: "What is missing in this case is any evidence that Lawn [the DEA Administrator] understood that by his alleged approval of the mission he was acquiescing *sub silentio* in plaintiff's expectation of a $250,000 payment." *Id.* at 28 (footnote omitted). As noted above, "[k]nowledge of the facts is the essential element of ratification," *United States v. Beebe,* 180 U.S. at 354, 21 S.Ct. 371, an element missing from *Henke,* and missing from the present case.

As noted above, plaintiffs name Colonel Salt as the ratifying official:

> In the case at bar the government offered to remove debris from Dureiko's park if Dureiko would agree to lease spaces for FEMA trailers. The terms of the agreement included Dureiko protecting the government from possible actions by individual mobile home owners whose property the government would be removing and the government's agreement to restore any property damaged in the debris removal process. The government accepted the terms of this contract when it entered Dureiko's property to prosecute its intent. The decision to enter the property was made by Col. Salt, a fully empowered contracting officer. His decision to take the benefits of the agreement ratified the contract with Dureiko, even if Dureiko's prior negotiations and interactions were with persons not possessing contracting authority.

(citations omitted).

During the evidentiary hearing in the present case, Colonel Salt was asked whether he was aware of any agreement to use only rubber-tired equipment at mobile homes, and to restore infrastructure. Colonel Salt stated that: "I wasn't aware of that arrangement," although he also indicated that he had no recollection of the specific arrangements with the park owners. While Colonel Salt, as a contracting officer with an unlimited war-

rant, may have possessed the authority to agree to and ratify an unsigned site restoration provision, the plaintiffs have not carried their burden to demonstrate that Colonel Salt knowingly authorized the use of a site restoration provision, included in an unauthorized use of a stockpile/burn debris permit, for a debris removal project for which such a provision normally is not included. Ratification requires Colonel Salt's full knowledge of all of the facts, *Schism v. United States*, 316 F.3d at 1294, which is not reflected in the record.

Plaintiffs cite the language of Task # 4, Section IV(C) given to the contractor Phillips & Jordan as support for their position that the site should be restored:

C. The Contractor shall use only rubber-tired equipment in the performance of this contract. The Contractor shall not use equipment authorized for debris removal under this contract for private work during the working hours designated under this contract. Also, the Contractor's personnel shall not solicit work from private citizens or others with manpower and equipment designated under this contract. The Contractor shall be responsible for filling to grade with like material all surface damage, such as rutting and cracks, caused by the Contractor's equipment during debris removal. The Contractor shall repair all damage to existing grade, road shoulders, underground/aboveground utilities, trees, shrubs, and grassed areas caused by the Contractor's equipment or personnel. The Contractor shall preserve and protect all existing structures which have not been designated for demolition. The Contractor shall preserve and protect vegetation such as trees, shrubs, and grass on or adjacent to the area of work.

Defendant responds that "Task Order 4 was a generic specification for the contractors that, contrary to Dureiko's contentions, was not specifically written for any of the mobile home parks. The Corps utilized such generic specification language from previous hurricanes and inserted it as precatory language into specifications contained in Task Order 4 to the extent it was feasible under the circumstances." Mr. Brady, Assistant Counsel at the Corps, testified that Task # 4 was used on all debris removal contracts for the Hurricane Andrew recovery effort, and was imported from another hurricane relief effort: "this specification was used on all the debris removal contracts, just something that was brought in by someone at the beginning of the job and perpetuated throughout the life of the hurricane." Colonel Salt confirmed that forms such as Task # 4 were brought in for the Hurricane Andrew recovery effort from other disaster recovery efforts, such as Hurricane Hugo.

The Task # 4 contractor, Phillips & Jordan, did attempt to use rubber tired equipment at Pine Isle and other mobile home parks, however, the rubber tires were being punctured during the debris removal. Mr. Brady received calls from the Corps' field inspectors indicating that the rubber tires on equipment were being damaged by metal debris during debris removal at the mobile home parks. As a result, Phillips & Jordan was permitted by the Corps to use track equipment for debris removal at Pine Isle and other sites. The record, however, contains insufficient indicia that Colonel Salt, Mr. Dragonnette, or anyone else with the requisite contracting authority, agreed to, or ratified an agreement with plaintiffs, to use rubber-tired equipment exclusively.[9]

9. The defendant also argues, in the alternative, that if there had been an agreement to use rubber-tired equipment exclusively, that the government would have been excused from performance due to the doctrine of impossibility or commercial impracticability, citing *Raytheon Company v. White*, 305 F.3d 1354 (Fed.Cir.), *reh'g denied* (2002) and *Seaboard Lumber Company v. United States*, 308 F.3d 1283 (Fed.Cir. 2002). The court notes that impossibility or commercial impracticability were found in neither of the two cases cited by the defendant. The commercial impracticability defense requires the defendant to demonstrate that: "(i) a supervening event made performance impracticable; (ii) the non-occurrence of the event was a basic assumption upon which the contract was based; (iii) the occurrence of the event was not [the defendant's] fault; and (iv) [the defendant] did not assume the risk of occurrence." *Seaboard Lumber Co. v. United States*, 308 F.3d at 1294. Defendant argues that the supervening event was the presence of sharp metal debris at Pine Isle which caused repeated blowouts to the rubber-tired debris removal equipment. However, the supervening event making performance

**356**

*Acceptance of Benefits*

■ Plaintiffs argue that the federal government "accepted the terms of the ROE [right of entry permit] when it accepted the benefits conferred by it," citing the United States Court of Claims in *Philadelphia Suburban Corporation v. United States.* In *Philadelphia Suburban,* the United States Coast Guard retained fire fighting foam belonging to the claimant, but argued that no personnel in contact with the fire fighting supplies had authority to contract, and resisted paying compensation. *Philadelphia Suburban Corp. v. United States,* 217 Ct.Cl. 705, 706–07, 1978 WL 8442 (1978). In *Philadelphia Suburban,* the United States Court of Claims observed that there is authority "for finding implied authority or ratification, in proper circumstances, where the Government has or takes the benefit of another's property." *Id.* at 707, 1978 WL 8442. The Court of Claims denied the government's motion for summary judgment, although "not intimat[ing] in any way that plaintiff is or is not entitled to recover," and returned the case to the Trial Division for a determination of whether an implied-in-fact contract arose under the circumstances, or whether retention of the foam supplies was ratified by a government representative properly authorized to do so. *Id.* at 707–08, 1978 WL 8442.

In *Prestex Inc. v. United States,* cited in *Philadelphia Suburban,* the United States Court of Claims stated:

Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or

services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the government elects to rescind an invalid contract. No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason. However, the basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods or services.

*Prestex Inc. v. United States,* 162 Ct.Cl. 620, 628, 320 F.2d 367, 373 (1963) (citations omitted). In *Prestex,* however, the government did not derive benefit from the claimant's military uniform cloth, leading the United States Court of Claims to grant the government's motion for summary judgment. *Id.,* 162 Ct.Cl. at 630–31, 320 F.2d at 374–75.

The court in *Gold Line Refining, Ltd. v. United States* summarized the *Prestex* rationale for recovery:

The Court of Appeals for the Federal Circuit has recognized the equitable remedy of quantum meruit as a basis of recovery under an implied-in-fact contract. *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1154 (Fed.Cir.1983). In *United States v. Amdahl Corp.,* 786 F.2d 387 (Fed. Cir.1986), the Federal Circuit observed:

Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it ac-

impracticable must not be foreseeable—it must be something unexpected. *United States v. Winstar Corp.,* 518 U.S. 839, 905–06 n. 53, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Seaboard Lumber Co. v. United States,* 308 F.3d at 1294–95; *Raytheon Co. v. White,* 305 F.3d at 1367; *Hercules Inc. v. United States,* 24 F.3d 188, 204 (Fed.Cir.1994), *aff'd,* 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). The presence of tire-puncturing, metal debris at hurricane disaster sites is not unexpected. Hurricane Andrew was not the first disaster to which FEMA and the Corps responded. In fact, Mr. Brady, the Corps' Assistant District Counsel during the Hurricane Andrew recovery effort, testified that "[t]he first time I saw this specification [Task

# 4] for a mobile home park, and I don't remember if it was Pine Isle or another, I told the contracting people who were working on it that it was impossible to perform, that you couldn't use rubber-tire vehicles on mobile home park[s]." The "impossibility" of operating rubber-tired vehicles across a landscape of metal debris was sufficiently obvious, expected and foreseeable that defendant has not made out the defense of commercial impracticability. However, given the court's finding that no government representative with the requisite contracting authority agreed to use rubber-tired equipment exclusively, the defendant's commercial impracticability argument is moot.

cepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract.

786 F.2d at 393. In reaching its decision, the *Amdahl* court relied upon the reasoning set forth in *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367 (1963). The Court of Claims there stated, in pertinent part, that "[e]ven though a contract be unenforceable against the government, . . . it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it." *Prestex,* 320 F.2d at 373.

The decisions in *Urban Data Systems, Amdahl,* and *Prestex* contemplate that when the government retains benefits in the form of goods or services under a contract determined invalid for failure to comply with certain regulatory requirements or bidding procedures, courts may grant relief of a quasi-contractual nature to the contractor. As the Court of Claims noted in *Prestex,* "ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason." *Prestex, Inc.,* 320 F.2d at 373.

*Gold Line Refining, Ltd. v. United States,* 43 Fed.Cl. 291, 295 (1999) (footnotes omitted). In *Gold Line,* jet fuel was delivered to the military pursuant to a contract containing an economic price adjustment clause which did not comply with the Federal Acquisition Regulation. *See Gold Line Refining, Ltd. v. United States,* 54 Fed.Cl. 285, 295, 297–98 (2002). Following *Prestex,* the court in *Gold Line* stated that it would permit a quantum valebant price adjustment for the jet fuel under an implied-in-fact contract theory. *Id.* at 297–98; *see also Gold Line Refining, Ltd. v. United States,* 43 Fed.Cl. at 296.

The *Prestex* line of cases, however, is distinguishable from the present case. The present case is controlled, instead, by the decisions of the United States Court of Appeals for the Federal Circuit in *Trauma Service Group v. United States* and *Perri v. United States.* In *Trauma Service Group,* the claimant provided the services of an x-ray technician to the United States Army. The x-ray services were outside the scope of a Memorandum of Understanding between the parties, and the claimant sought reimbursement from the government. *Trauma Serv. Group v. United States,* 104 F.3d at 1324, 1326. The claimant attempted to rely on an implied-in-fact contract for recovery, without success. The Federal Circuit stated that implied-in-fact contracts require agents of the government with the requisite authority, just as express contracts do, and no one with authority obligated the government to pay for the x-ray services. *Id.* at 1326 (citing *City of El Centro v. United States,* 922 F.2d at 820).

However, even if TSG [Trauma Service Group] could show that the use of the x-ray technician was outside the scope of the agreement, the mere receipt of such services, even to the benefit of the Government, would not create an implied-in-fact contract to pay for them. *See Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). Such implied-in-law contract scenarios are beyond the purview of the Tucker Act. *Hercules,* 516 U.S. at 430, 116 S.Ct. at 989 ("But in any event we are constrained by our limited jurisdiction and may not entertain claims 'based merely on equitable consideration.'") (quoting *United States v. Minnesota Mut. Inv. Co.,* 271 U.S. 212, 217–18, 46 S.Ct. 501, 502–03, 70 L.Ed. 911 (1926)); *Merritt,* 267 U.S. at 340–41, 45 S.Ct. at 279.

\*     \*     \*     \*     \*     \*

No one at the MTF [military treatment facility], including the MTF commander, had the independent authority to bind the Government. Therefore, this alleged implied-in-fact contract for the direct reimbursement of the x-ray technician cannot be enforced under the Tucker Act, even if

TSG could show the remaining elements of contract formation.

Thus, TSG cannot show either an express or implied-in-fact contract between itself and WACH [Winn Army Community Hospital]. On this record, TSG would have to base any action against the United States on a contract implied-in-law or on a tort theory. The Court of Federal Claims lacks jurisdiction to hear these suits. *See Merritt*, 267 U.S. at 341, 45 S.Ct. at 279; *United States v. Nederlandsch–Amerikaansche Stoomvart Maatschappij*, 254 U.S. 148, 153, 41 S.Ct. 72, 73, 65 L.Ed. 193 (1920).

*Trauma Serv. Group v. United States*, 104 F.3d at 1327 (footnote omitted); *see also Schism v. United States*, 316 F.3d at 1284 (government representatives lacked authority to form "a valid, binding contract," and summary judgment was granted for the government); *Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1257 n. 4 (Fed. Cir.2002) (the contracting officer was without authority to agree to a provision in the contract contrary to the Federal Acquisition Regulation, but the remainder of the contract "remained valid and enforceable"); *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed.Cir.1998); *Janowsky v. United States*, 133 F.3d 888, 891–92 (Fed.Cir.1998) (distinguishing *City of El Centro v. United States*, 922 F.2d at 823, which denied the claim because the government had not received a direct benefit, and *Silverman v. United States*, 230 Ct.Cl. 701, 710, 679 F.2d 865, 870 (1982), which concluded that the claimant was entitled to payment because the ratifying government official possessed the authority to approve vouchers for goods and services).

The United States Court of Appeals for the Federal Circuit reconciled the *Prestex* and *Trauma* cases in *Perri v. United States:*

The Court of Federal Claims' jurisdiction over claims founded on an express or "implied contract with the United States" "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules, Inc. v. United States*, 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (citations omitted); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed.Cir.1997). Recovery in quantum meruit, however, is based upon a contract implied in law. *Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289, 296 (1982). The theory is that if one party to a transaction provides goods or services to the other party that the parties intended would be paid for, but the recipient refuses to pay for them, the law will imply a contract for the recipient to pay the fair value of what it has received. *See United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed.Cir.1986).

Perri relies upon cases in which this court, the Court of Claims, and the Court of Federal Claims recognized quantum meruit recovery. *See, e.g., Gould, Inc. v. United States*, 935 F.2d 1271 (Fed.Cir. 1991); *Prestex, Inc. v. United States*, 162 Ct.Cl. 620, 320 F.2d 367 (1963). Those cases, however, involved situations in which the plaintiff provided goods or services to the government pursuant to an express contract, but the government refused to pay for them because of defects in the contract that rendered it invalid or unenforceable. Since in that circumstance it would be unfair to permit the government to retain the benefits of the bargain it had made with the plaintiff without paying for them, the court utilized quantum meruit as a basis for awarding the plaintiff the fair value of what it supplied to the government.

We know of no case, however, and Perri has not cited any, in which either we, the Court of Claims, or the Court of Federal Claims has permitted quantum meruit recovery in the absence of some contractual arrangement between the parties. In the present case, the Court of Federal Claims ruled that there was no contract between Perri and the government to pay him twenty-five percent of the amount the government received from the forfeiture that Perri alleged he aided the government in obtaining. The Court of Federal Claims correctly dismissed Perri's quantum meruit claim.

*Perri v. United States*, 340 F.3d 1337, 1343–44 (Fed.Cir.2003); *see also Perri v. United*

*States,* 53 Fed.Cl. 381, 409 (2002) ("The benefits the Government received as a result of the FBI's relationship with Perri, including the forfeiture and sale of Old Westbury Farm, flowed from Perri's service as a confidential informant and cooperative witness— for which he was paid nearly $81,000.00—not from any mutual understanding, or contract implied-in-fact, concerning the [Old Westbury] horse farm."), *aff'd,* 340 F.3d 1337 (Fed.Cir.2003); *Urban Data Sys. v. United States,* 699 F.2d 1147, 1154 n. 8 (Fed.Cir. 1983) (the price terms of the subcontracts were invalid, so the court approved reimbursement on a *quantum valebant* basis for the reasonable value of the supplies and services; "[h]ere we deal with a contract implied in fact because the parties did have an actual agreement to supply and buy the paper . . . ."); *Shearin v. United States,* 25 Cl.Ct. 294, 296–98 (1992) (no government representative had the authority to pay the claimant, and the exception permitting payment for goods and services accepted by the government, discussed in *United States v. Amdahl Corp.,* 786 F.2d 387, 393–94 (Fed.Cir.1986), was not applicable), *aff'd,* 983 F.2d 1085 (Fed.Cir.1992) (table).

The present case, like the *Perri* case, does not fit into one of the "certain limited fact situations," in the words of the United States Court of Claims in *Prestex,* in which courts will grant relief of a quasi-contractual nature. *Prestex Inc. v. United States,* 162 Ct.Cl. at 628, 320 F.2d at 373. Plaintiffs have not demonstrated a *Prestex*-type receipt of goods or services by the government, for which the government has refused to pay. The court has found no meeting of minds and no agreement or ratification by a government representative with the requisite authority on the subject of site restoration or exclusive use of rubber-tired equipment. The "core" agreement between the parties, as described by the plaintiffs, involving the government's removal of debris from Pine Isle and Mr. Dureiko's leasing of mobile home pads to the government for a fee, for use as temporary shelter for displaced individuals, provides the basis for the government's entry onto Pine Isle. Consideration for the government's use of Pine Isle to temporarily house displaced individuals was the debris removal and the rent paid for the mobile home pads used. Plaintiffs have not demonstrated that a government representative with the requisite authority obligated the government to the site restoration provision or exclusive use of rubber-tired equipment, and have not demonstrated a *Prestex*-type rationale for relief.[10]

10. In addition to claims stemming from site restoration provisions and use of track equipment, there are claims for utility repair at Pine Isle. The parties have stipulated that Joseph Dureiko leased 101 mobile home pads to FEMA as temporary housing for displaced individuals. A Mobile Unit Pad Lease for Pine Isle indicated that the government would pay $240.00 per month per leased pad, that the pads would be sublet to disaster victims and, in an addendum to the lease, that "FEMA will repair ALL utilities on FEMA leased sites." (emphasis in original). Task # 12 stated that "[t]he contractor shall perform all necessary work to inspect, remove, repair or replace to pre-Andrew condition in accordance with current codes all sewer, water, and electric facilities affecting 100[sic] lots assigned to the Federal Emergency Management Agency (FEMA) at the Pine Isle Mobile Home Park (28600 S.W. 132nd Ave., Homestead, Florida)." Modification P00020 to Task # 12 stated that the "Contractor shall provide all labor and materials for final utility connections to FEMA-provided mobile homes. Utilities are electricity, water, and sewer." The record reflects the government's understanding that it would restore utilities only for the 101 leased pads, to support temporary housing for the homeless.

The plaintiffs' complaint acknowledges that the government contracted for repairs of utilities, but alleges that "[m]uch of this [utility] work was performed in a negligent and substandard manner and not in compliance with local CODE requirements and must be redone." Martin Dureiko, the son of plaintiff Joseph Dureiko and a long time employee at Pine Isle, testified that an electrical inspector came to Pine Isle, and, as a result of the county inspection, utility work was reaccomplished. Far from indicating that the inspection system failed, this testimony indicates that the system was working properly. Martin Dureiko further testified that he had "no way of knowing" if the water and sewer lines installed were in code compliance, and that the government "only repaired or replaced the section they needed and not to code." The record, however, does not support the contention that repair work was not to code. Douglas Campbell was a FEMA Disaster Assistance Employee during the hurricane recovery effort. Part of his duties were to coordinate the county code inspections of the repaired utilities. Mr. Campbell testified that the utilities were restored to code, otherwise a certificate of occupancy for each of the mobile homes would not have been issued and the utilities would not have been turned on for the tem-

*Release of Claims*

■ Before the government entered the property, Joseph Dureiko also executed an undated release of claims. Mr. Dureiko's signature on the release was witnessed by Gregory Landry, a FEMA Disaster Assistance Employee during the hurricane recovery effort. The release follows verbatim:

## RELEASE FOR DEMOLITION OF MOBILE HOME PARK AND REMOVAL OF DEBRIS

The undersigned hereby certifies and warrants that he is the owner or authorized agent of the owner [sic] the following described mobile home park:

[Pine Isle MHP

28600 SW 132 Ave

Homestead, FL 33033]

which has been declared uninhabitable under Chapter 17C of the Code of Metropolitan Dade County, Florida.

In consideration for Dade County or the federal government's undertaking the demolition of mobile homes and removal of the debris from the above mobile home park, the undersigned hereby releases Dade County, [State of Florida,] and the United States Government, and their respective officers, employees and contractors from all claims of whatever nature arising from such demolition and removal.[11]

John Brady, the Corps' Assistant District Counsel, testified that the purpose of the release signed by Mr. Dureiko was to release the government from "any liability" in connection with the work performed at Pine Isle:

Q. What other documents were you looking for before you ultimately signed off on proceeding with the debris removal with the contractor?

A. The only other document I was looking for was a release from the property owner of liability on the part of the State or local Government, the Corps of Engineers and the Corps of Engineers' contractors for any liability arising out of doing the work on the mobile home park.

Q. And can you turn to Joint Exhibit 5, please, entitled Release for Demolition of Mobile Home Park and Removal of Debris. Are you familiar with this type of document?

A. Yes.

Q. Is this the type of release that you were also requiring before the contractor could proceed with demolition and debris removal?

A. Yes.

Joseph Dureiko testified that the release he signed was for the purpose of releasing the government from any liability for the contents of the mobile homes at Pine Isle. Mr. Dureiko testified as follows:

Q. So you had conversations and you don't recall when this was that Exhibit 5 [the release] was brought to you, but you had conversations with Government employees about this release document?

A. Yes, I did. I had considerable discussion about it when he brought it to me. It was explained to me that with 286 different owners in there it was impossible for the Government to remove all that stuff and get okay's from each of those individual people and they had to have some responsible party give them permission to go in there and do it so that after they had done it the individual tenants wouldn't come along and said, "Oh, you shouldn't have taken away my home, I could have repaired it, or I had heirlooms in there or I had money buried in the mattress, and

porary shelter. Mr. Campbell's supervisor during the hurricane recovery effort, Donny Lee Kidd, also testified that the utilities were brought up to code before tenants were allowed to occupy the mobile homes. Mr. Kidd added that this meant upgrading utilities where there had been upgrades in code requirements subsequent to the original installation of the utilities. Plaintiffs have not carried their burden to demonstrate that utilities were required to have been restored beyond the 101 leased pads, or that the utility work performed on the 101 pads was not in code compliance.

11. The bracketed material was added by hand to the release form.

that sort of thing, and that this was the reason they absolutely had to have somebody allow them to do it, and I was the only one available."

Q. So you were explained [sic] by somebody from the Government that this release had to do with the contents of mobile homes?

A. Of the homes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Do you understand this document [the release] to mean that you would not sue the Government as a result of the debris removal process, that you released them from claims?

A. As it was explained to me, this document did not affect my property. It only protected the Government from their removal of the tenants of the park's property. That's the way it was explained to me by the people who delivered it, and I had already had the package of how it was going to be done and how I was protected and so forth.

Q. So just so that I understand, you signed this release not based on the language that was in the document but based on what was told to you as what the document meant?

A. That's right. It was explained to me that way.

When asked the identity of the government representative(s) who "explained" the release to him, Mr. Dureiko stated: "I think it was Landry, but it could have been Campbell, but it seems to me that Landry came with this one." Gregory Landry was a FEMA Disaster Assistance Employee during the hurricane recovery effort. Mr. Landry died prior to the trial of this case, however, prior to his death he was deposed, and his deposition was stipulated by the parties as Joint Trial Exhibit 27. Mr. Landry witnessed Mr. Dureiko's signature on the release. Concerning the release, Mr. Landry was asked at his deposition:

Q. Do you recall how you explained this form [the release] to the park owners?

A. It's pretty much self-explanatory.

Q. Okay. Well, did you tell the park owners, do you recall any specific conversations from any park owners about this form?

A. Off the top of my head, no. It's fairly well self-explanatory. It's a release for demolition for mobile home parks and remove all of debris [sic].

The other government representative identified by Mr. Dureiko, Douglas Campbell, also was a FEMA Disaster Assistance Employee during the hurricane recovery effort. Mr. Campbell was asked about the release during the trial:

Q. Just a couple more questions. Let me show you Joint Exhibit Number 5 [the release]. Have you ever seen this exhibit before?

A. I saw it at our deposition we did.

Q. At the time, do you recall if you were there when Mr. Dureiko signed Joint Exhibit Number 5?

A. I don't have a clear recollection of that.

In its initial opinion, this court viewed the release signed by Mr. Dureiko as barring plaintiffs' claims, rejecting Pine Isle's assertions that the release was entered into only under duress or as the result of undue influence. *See Dureiko v. United States (Dureiko II)*, 42 Fed.Cl. at 577–78. "As a general rule, the execution of an unrestricted release, pursuant to a government contract, bars the later assertion of claims against the government with respect to that contract." *Dairyland Power Coop. v. United States*, 27 Fed.Cl. 805, 811–12 (1993), *aff'd*, 16 F.3d 1197 (Fed.Cir.1994) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391–92 (Fed.Cir.1987) and *J.G. Watts Constr. Co. v. United States*, 161 Ct.Cl. 801, 805, 1963 WL 8559 (1963)). On appeal, the United States Court of Appeals for the Federal Circuit affirmed in part, rejecting Pine Isle's duress and undue influence arguments, but found the language of the release to be ambiguous, and summary judgment, therefore, not supportable. The Federal Circuit addressed the release issue extensively in its decision:

In interpreting the release, we first ascertain whether its language clearly bars the asserted claim. *See King v. Depart-*

*ment of the Navy,* 130 F.3d 1031, 1033 (Fed.Cir.1997). If the release is ambiguous as to its scope of coverage, we construe its language to effect the parties' intent at the time they executed the release. *See id.* The parties' intent is a question of fact, *see Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir. 1988) .... In the absence of sufficient factual allegations supporting the parties' mutual intent, we construe the ambiguous contract provision against the drafter, unless the ambiguity is patent. *See Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.,* 105 F.3d 629, 634 (Fed.Cir.1997); *cf. Triax Pacific, Inc. v. West,* 130 F.3d 1469, 1475 (Fed.Cir.1997) (discussing patent ambiguity doctrine)....

The release extinguishes "all claims of whatever nature arising from such demolition and removal." Although the government fervently argues that this language plainly encompasses Pine Isle's breach of contract, taking, and inverse condemnation claims, we are not so certain. The phrase "such demolition and removal" refers to the earlier phrase "the federal government's undertaking the demolition of mobile homes and removal of *the debris* from the above mobile home park." (emphasis added). It is unclear whether this phrase covers only the demolition of mobile homes and the subsequent removal of *mobile home debris,* as Pine Isle suggests, or the demolition of mobile homes and the removal of *any debris,* as the government maintains.

Furthermore, FEMA's alleged contract with Pine Isle included obligations extending far beyond mere mobile home demolition and mobile home debris removal. For example, Task #12, which allegedly reflects the standards for utility repair agreed upon by the parties, provides that "[t]he Contractor shall perform all necessary work to inspect, remove, repair, or replace to pre-Andrew condition in accordance with current codes all sewer, water, and electric facilities affecting the 100 lots assigned to the Federal Emergency Management Agency." It is unclear whether the phrase "all claims of whatever nature arising from such demolition and removal" also includes claims relating to FEMA's restoration obligations, since activities in furtherance of such obligations are not plainly related to mobile home "demolition" or "debris removal."

Given these ambiguities, we turn to the parties' extrinsic evidence of intent to aid our interpretation of the release. Pine Isle alleges that Dureiko only signed the release because FEMA represented that only he, as owner of the Park, could release the government from liability to tenants for removing their personal property. Consequently, Dureiko only intended to release the government from liability arising from FEMA's disposal of this property (e.g., their mobile homes and personal belongings). Pine Isle emphasizes that it could not have intended to release FEMA of its obligation to comply with the terms of Task #4 and #12, having vigorously bargained for them only shortly before. The government offers nothing to dispute Dureiko's intent in signing the release.

... If Pine Isle's allegation regarding FEMA's representations and Pine Isle's intent in signing the release are correct, the release will bar only claims arising from FEMA's demolition of the mobile homes and its removal of the mobile homes and their contents from the Park; it will not bar Pine Isle's claims for breach of contract ... to the extent that such claims are predicated on conduct outside the demolition and removal of the Park tenants' property.

The alleged contract bolsters Pine Isle's representation of the parties' intentions in signing the release, and thus supports its narrow interpretation of the release. As allegedly reflected by Tasks #4 and #12, the contract provided very specific terms directed to the cleanup methods and the Park's restoration to its pre-Andrew condition. Again, accepting Pine Isle's allegation that such a contract existed, we cannot hold that the release could have eliminated any liability for breach of the alleged contract terms. To so hold would utterly eviscerate the contract. It would have been nonsensical for Pine Isle, fearful that Phillips & Jordan or another cleanup contractor might destroy its property, to aggressively negotiate extremely detailed

terms for the Park's cleanup and restoration to pre-Andrew condition, and then almost immediately relinquish its right to enforce these terms by signing a release extinguishing claims arising under these terms. On remand, the Court of Federal Claims must determine whether the extrinsic evidence supports Pine Isle or the government's interpretation of the release. *Dureiko v. United States (Dureiko III)*, 209 F.3d at 1356–58 (emphasis in original).

The United States Court of Appeals for the Federal Circuit found that the release language was unclear as to the meaning of the phrase, "all claims of whatever nature arising from such demolition and removal." *Id.* at 1357. Accepting the dictates of the Federal Circuit that the release is not clear and unambiguous, further review by the court of the release upon remand was required. The circumstances of the use of the release, a major disaster, render such ambiguities, to the extent that they exist, understandable. The Federal Circuit also concluded that this court should turn to extrinsic evidence to interpret the release. *Id.* at 1357–58; *see also Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375–76, 1379 (Fed.Cir.2004); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir.), *reh'g denied, en banc suggestion declined* (1996) (citing *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972)); *Perry–McCall Constr., Inc. v. United States*, 46 Fed.Cl. 664, 671 (2000). Absent a patent ambiguity, which the defendant has not argued and the court does not find, "[i]n the absence of sufficient factual allegations supporting the parties' mutual intent, we construe the ambiguous contract provision against the drafter ...." *Dureiko v. United States (Dureiko III)*, 209 F.3d at 1357.

Joseph Dureiko's sworn testimony is that the intent of the parties was to limit the release to claims arising from demolition of the mobile homes at Pine Isle. Although the intent of the release document offered by the government representatives appeared clear to this court and consistent with the hurricane relief efforts upon its earlier review, at the hearing following remand, the govern-

ment offered little testimony in support of its position. The testimony of government representatives was less than conclusive as to whether or not Mr. Dureiko was instructed regarding limitations on the scope of the release during the hurricane recovery effort. The record does reflect Joseph Dureiko's concerns about additional damage to Pine Isle from the debris removal process. A release of all claims against the government and the government's contractors is not consistent with Mr. Dureiko's expressed concerns about further damage to Pine Isle. A release of claims limited to the demolition of mobile homes is more consistent with Mr. Dureiko's expressed concerns. Moreover, the government did not produce specific evidence to contradict Mr. Dureiko. Under the rules of law reiterated by the Federal Circuit, and quoted verbatim above, the court finds that, under the present circumstances, the ambiguous release provision identified by the Appeals Court is to be construed against the drafter, in this case, the defendant. The release in this case does not discharge the defendant from liability for breach of contract claims. However, the court earlier rejected plaintiffs' breach of contract claims. Therefore, under such circumstances, defendant does not require the release as a defense.

### Third Party Beneficiary

■ The complaint also alleges that plaintiffs are third party beneficiaries of the contract between the government and Phillips & Jordan. Plaintiffs argue that the provisions in Task # 4, for debris removal and repair at Pine Isle, were intended by the government and Phillips & Jordan to benefit plaintiffs. The issue is whether a third person may sue for breach of a contract to which the third person is not a party. The United States Supreme Court has stated that

it is recognized as an exception to the general principle, which proceeds on the legal and natural presumption that a contract is only intended for the benefit of those who made it. Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least,

show that it was intended for his direct benefit.

*German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912); *see also Glass v. United States,* 258 F.3d 1349, 1354 (Fed.Cir.2001) ("In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly."), *amended by,* 273 F.3d 1072 (Fed. Cir.2001); *Montana v. United States,* 124 F.3d 1269, 1273 (Fed.Cir.1997); *Slattery v. United States,* 35 Fed.Cl. 180, 184 (1996) ("[I]n order for a third party to have standing to bring a claim such as that brought in the instant case, the contract itself must reflect an intent to benefit that third party." (citation omitted)).

Defendant argues that plaintiffs were incidental, not direct, beneficiaries of Task # 4 given to the contractor Phillips & Jordan. Defendant contends that:

> Task Order 4 was a generic specification for the contractors and was not written specifically for the mobile home parks or Pine Isle. The Corps utilized generic specification language from previous hurricanes and inserted it into specifications contained in Task Order 4. Moreover, the goal of the debris removal operations was to provide sites for FEMA mobile homes to be used for the provision of temporary housing. There is no evidence to indicate that the Corps intended to benefit Dureiko. Accordingly, Dureiko was not an intended third party beneficiary to the contract between the Corps and Phillips & Jordan.

(citations omitted). The record reflects that the government approached Mr. Dureiko for the primary purpose of identifying and leasing mobile home pads as temporary housing for individuals displaced by the hurricane. To further that primary purpose, debris was removed from Pine Isle. Plaintiffs were incidental beneficiaries of the intended purpose of the government, and no right arose in plaintiffs to sue for breach of Task # 4. Neither the record nor Task # 4 reflect an intention to create enforceable rights in plaintiffs.

In the *Ables* case, the court similarly concluded that:

> The uncontested materials at hand indicate that the primary purpose of the agreement between the union and the Air Force was to resolve certain disputed issues. While the agreement contemplated the use of arbitrators to further realization of this primary purpose, the agreement was not entered into for the primary purpose of benefiting the arbitrators, including plaintiff.... While plaintiff benefits from this agreement in the sense that use of his services would result in payment to him by the union and the Air Force, this does not necessarily mean that the agreement itself was intended to create an enforceable right in plaintiff to said payment as an intended beneficiary. Rather, this indeterminate language suggests that plaintiff's enforceable right to payment for these services would emanate from separate and independent agreements plaintiff would have with the Union and the Air Force. Uncontested facts support this interpretation. The most that can be said for plaintiff's position under the agreement in question is that he was an incidental beneficiary. As such, he has no enforceable rights under the agreement. *See Restatement, Second, Contracts, Sec.* 302(e) (1979); *A. Corbin, Contracts, Sec.* 779C at 40–41 (1951).

*Ables v. United States,* 2 Cl.Ct. 494, 500 (1983), *aff'd,* 732 F.2d 166 (Fed.Cir.1984) (table). This court concluded above that the government did not obligate itself to a site restoration provision in the Pine Isle right of entry permit, and did not agree to the exclusive use of rubber-tired equipment in Task # 4. The court further concludes that the government did not intend to provide plaintiffs third party rights through the mechanism of the task order, which it did not provide to plaintiffs directly.

Defendant also argues that plaintiffs are precluded from asserting a third party beneficiary claim against the government in the present case because plaintiffs previously asserted a third party beneficiary cause of action, seeking the same damages as in the instant case based on the same underlying

facts presented in this Court of Federal Claims case, in a state court action against Phillips & Jordan. Defendant contends that the state court action was dismissed based on a settlement agreement with Phillips & Jordan, and is barred by the doctrine of *res judicata*, or claim preclusion. *Joseph Dureiko and Arlene Dureiko, as Trustees and Southern Pine Isle Corp., a Florida Corp. v. Phillips & Jordan, Inc., a North Carolina Corp.,* No. 93–11659 CA (13), (Fla. 11th Cir. Ct. Aug. 5, 1997) (final order of dismissal). Plaintiffs argue that the settlement with Phillips & Jordan did not compensate plaintiffs for all their losses, but also suggests that the defendant may be entitled to a set-off, reflecting the prior settlement. The court does not reach these damages issues because, on other grounds, no liability on the part of the government has been found.

## CONCLUSION

For the foregoing reasons, the clerk's office shall **DISMISS** the plaintiffs' complaint, with prejudice, and enter **JUDGMENT** for the defendant. Each party shall bear its own costs.

**IT IS SO ORDERED.**